IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

James A. Mays,

      Petitioner.

    v.

Thomas Carroll,
Warden, Beau Biden
Attorney Of The State
Of Delaware,

      Respondents.

C. A. No. 07-417-Gms

PETITIONER'S OPENING BRIEF FOR WRIT OF HABEAS CORPUS

9-27-2007

Date

*James A. Mays*

James A. Mays # 295762
1181 Paddock Road
Delaware Correctional Center
Smyrna, Delaware 19977

## TABLE OF CONTENTS

TABLE OF CASES AND CITATIONS......................... II

NATURE AND STAGE OF PROCEEDINGS...................... III

STATEMENT OF FACTS................................... IV

ARGUMENTS........................................... 1. through 17.

EXHIBITS CONSISTS OF ALL REFERENCES TO TRIAL TRANSCRIPT PAGES

AND OTHER EXHIBITS THAT ARE MENTIONED IN THE BRIEF, THEY ARE

PLACED IN CHRONOLOGICAL THAT THEY ARE MENTIONED FOLLOWING

PAGE ...................................................... 17.

I

## TABLE OF CASES AND CITATIONS

Pages

Arizona v., Roberson, 486 U.S. 675. (1988)............. 4.

Edwards v., Arizona, 451 U.S. 477. ( 1981)..............4.

Jackson v. Virginia, 99 S.Ct. 2781. (1979)..............1.

Le v. Mullin, 311 F.3d 1002 (2002).......................1, 14.

Manson v. Brathwaite, 432 U.S. 98..........................6, 7.

Miranda v. Arizona, 384 U.S. 436...........................4.

Murray v. Carrier 106 S.Ct. 2639...........................3.

Simmons v. United States, 390 U.S. 377................... 6.

Strickland v. Washington, 466 U.S. 684...................5, 8, 12, 14, 16.

Tomlin v. Myers, 30 F.3d 1235, 1251. (1993)................8.

United States v. Archibald, 734 F.2d 938. (1984)...........8.

United States v. Cronic, 466 U.S. 659.......................16.

United States v. Hill, 967 F.2d 266 (1992)....................8.

United States v. Molina, 934 F.2d 1440, 1447. (1991)..........9. 12.

United States v. Sanchez, 988 F.2d 1384, 1389.(1993)...........6.

United States v. Zeiler, 427 F.2d 1307..........................8.

Wiggins v. Smith, 123 S.Ct. 2527...............................5.

Williams v. Taylor, 120 S.Ct. 1495.............................5
In re Winship, 397 U.S. 364....................................2.

ii

## NATURE AND STAGE OF THE PROCEEDINGS

The record reflects that the defendantwas arrested on June 21, 2000 and was indicted July 31, 2000 on the charges of attempted murder first degree, robbery first degree, possession of a firearm during the commission of a felony (2 counts), conspiracy 2nd dgree.

All other charges were either nolle prossessed or severed. trial began February 28, 2002 and ended  March 11, 2002. the defendant was convicted on all charges for which he went to trial, he was sentenced to a total of 30 years at level (5). the defendant appealed to the Delaware Supreme Court, the Supreme Court affirmed.

The defendant filed a Superior Court Rule 61 on JUne 13, 2005 this appeal was denied in part and summarily dismissed in part, the defendant in turn filed an appeal in the Delaware Supreme Court appealing the Superior Court's decision, this appeal was denied, now the petitioner seeks to have this Honorable Court to entertain his Writ of Habeas Corpus.

III

## STATEMENT OF FACTS

The record reflects that the defendant James A. Mays was arrested on JUne 21, 2000 and charged with the following. Attempted MUrder 1st Degree, Possession Of A Firearm During Commission of a Felony, Robbery 1st Degree, Assault 1st Degree, Possession Of Firearm By Person Prohibited, Conspiracy 1st, Possession Of Firearm During Commission of a Felony, and Conspiracy 2nd.

Trial commenced on February 28, 2002 and was held on the following days, March 4, 5, 6, 7, 8, and 11. 2002. The defendant was found guilty of Attempted murder in the 1st degree, Robbery 1st degree, 2 counts of Possession of Firearm during commission of a felony, and conspiracy 2nd. The defendant was sentenced to 30 years.

DEFENDANT WAS DENIED DUE PROCESS, WHEN
THE STATE FAILED TO PUT FORTH EVIDENCE
AS TO SPECIFIC INTENT OR PREMEDITATION
OF THE CHARGES. SECURED BY THE FIFTH,
SIXTH AND FOURTEENTH AMENDMENTS.

## STANDARD OF REVIEW

Whether a rational trier of fact could
find beyond a reasonable doubt in the
light most favorable to the prosecution.
The necessary elements to find the pet-
itioner guilty of attempted murder first
degree.

In a challenge to a state conviction brought under habeas corpus stat-
ute, which requires federal court to entertain state prisoners claim that
he is being held in custody in violation of the constitution or laws of the
United States. The applicant is entitled to habeas corpus relief if: (1) it
is found upon the evidence adduced at trial, no rational trier of fact cou-
ld have found proof beyond a reasonable doubt, and (2) review of the record
in habeas corpus proceeding in the light most favorable to the prosecution,
could not establish that a rational fact finder, could not have found the
accused guilty beyond a reasonable doubt. Jackson v. Virginia, 99 S.Ct 2781
(1979).

The petitioner contends that the Supreme Court in it's Order, Mays v.
State, No. 493, 2006 issued April 24, 2007. has misconstrued the issue, and
therefore, has not addressed the merits of the issue presented by the peti-
tioner. Le v. Mullin, 311 F.3d 1002, 1013. (2002). While the issue may app-
ear to be an ineffective assistance of counsel claim due to the fact that,
the petitioner has asserted that through counsel's cumulative errors and
deficiencies the state was enabled to convict him, without sustaining it's
burden of proof.

In essence the state has obtained a conviction under a lesser standa-
rd, than that required by the Due Process CLause articulated in the United
States Constitution, which protects an accused against conviction except

1

on proof beyond a reasonable doubt of every factnecessary to constitute the crime with which he is charged. In re Winship, 397 U.S. at 364. The very wording enclosed in the caption of the argument asserted by the petitioner states: " the state failed to put forth evidence as to specific intent or premeditation of the charges."

The petitioner asks this court to consider whether there was sufficient evidence to justify a rational trier of fact to find guilt beyond a reasonable doubt, as well as, whether the prosecution proved the necessary elements of the charges, to sustain it's burden that the defendant was guilty of attempted murder first degree. In re Winship.

The burden of proof consists of two parts; the burden of persuasion, and the burden of production, while it appears on face value that the prosecution was able to persuade the jury into returning a verdict of guilty, a closer review of the evidence adduced at trial and contained in the record illustrates that, the state has failed to sustain it's burden, and it is this court that must grant the relief sought by the petitioner, due to the lack of evidence adduced at trial, as well as, in the record, which cannot substantiate that a rational fact finder could have found the necessary elements of the charges needed to find the petitioner guilty beyond a reasonable doubt.

The totality of the evidence demonstrates that the light most favorable to the prosecution depicts a case in which, every witness that testified that they were eye witnesses to the crime, admitted in open court that they were drunk, and / or intoxicated on alcohol and / or marijuana, most of the witnesses when asked, further admitted that they had been or were facing the possibility of being convicted for crimes of dishonesty.

It must not be overlooked that the witness Matthew Couch was lead by officer Bradford Milton, to say that " James, the petitioner " pulled a

2

gun, see exhibit [ page 20 of witness's Statement ], the witness Erica Bell had been threatened to be charged as a get away driver, for the crime that the petitioner was charged with, see exhibit [ page 13 of witness's statement], the witness John Lackford had warrants for unknown reasons, this witness irreparably identified the petitioner at an out-of-court identification conducted by officer Bradford Milton, moreover, this witness had a class G felony for carrying a concealed deadly weapon, see exhibits [ pages 9, 13, 16,17.].

It is further the petitioner's contention that, no gun was ever linked to him, more importantly, there was never any tests conducted to see if there were traces of gun powder residue on the petitioner or his clothing, this....in and of itself should clearly intrigue this court's interests, as to why these steps were never considered or taken, especially in light of the fact that the petitioner had been arrested, within a 24 hour time frame, that this heinous crime occurred.

The petitioner asks this court to look at the evidence before it's eyes, the witnesses above, all felt a threat from an external pressure, whether that pressure was from the thinly disguised threats of officer Milton, or whether that pressure came from a shoplifting charge, a traffic violation, or whether that pressure came from a charge of possession of a deadly weapon, for which these witnesses clearly received leniency for, this court must view these factors and more, as factors that substantially impaired the truth finding function, thus calling into question, the reliability of the petitioner's legal guilt, Murray v. Carrier, 106 S.Ct. 2639 (1986).

The conclusion is unavoidable, the fundamental fairness of the petitioner's state court proceedings has been stripped away, thus the petitioner respectfully asks this court, to grant an evidentiary hearing, or in the alternative, reverse the judgment of conviction.

3

DEFENDANT WAS DENIED DUE PROCESS AND
THE EFFECTIVE ASSISTANCE OF COUNSEL,
WHEN COUNSEL FAILED TO FILE MOTION TO
SUPPRESS BEFORE TRIAL. SECURED BY THE
FIFTH, SIXTH AND FOURTEENTH AMENDMENTS.

## STATNDARD OF REVIEW

Whether counsel's performance fell be-
low an objective standard of reasonab-
leness, and whether counsel's deficie-
ncies prejudiced the defense.

The record before the court illustrates that the petitioner James A.
Mays was interrogated at the New Castle County Police Department by Det.
Brad Milton. The petitioner asserts that in viewing exhibits [ Pages 3,4.
of his out of court statement ], this court can easily adduce that the
petitioner invoked his right to counsel, there was no ambiguity, and all
interrogation should have ceased once the petitoner asked, " can-I-call
my lawyer ?" at the point the accused should have been given the opport-
unity to contact his lawyer. see Arizona v. Roberson, 486 U.S. 675, 687-
88. (1988); Miranda v. Arizona, 384 U.S. 436.

The petitioner's statement was therefore taken in violation of " Mi
-randa " and the admission of those statements during the prosecution's
case in chief, violated thye petitioner's clearly established rights und
-er the Fifth and Fourteenth Amendments, see Edwards v. Arizona, 451 U.S.
477, 485-86. (1981).

Trial court admitted that the accused had invoked his right to cou-
nsel and compounded the error, when it questioned audibly, whether it
had the authority to consider, what occurs once an accused invokes his
right to counsel, see exhibits [ Trial Transcript pages 31,32,34. ]
Trial court further ruled that the petitioner's right to move for supp-
ression of the statement was waived because counsel failed to file at
the appropriate time, see exhibits [ Trial Transcript page51, Superior
Court Order I.D.0006015793 at page 13.] " counsel's motion to suppress

4

was untimely ".

The Supreme Court clearly identified the correct legal principle, anbd further stated that trial court abused it's discretion and committed error, see exhibits [ Supreme Court Order no. 391, 2002 at pages 9,10,11 ] A federal court may grant habeas relief under unreasonable application prong of habeas corpus statute, when state court has missapplied the governing principle to set of facts different from those of the case in which the principle is announced. see Williams v. Taylor, 120 S.Ct. 1495; Wiggins v. Smith, 123 S.Ct. 2527.

A defendant in a criminal proceeding is entitled to effective assistance of counsel in order " to protect the fundamental right to a fair trial " Strickland v. Washington, 466 U.S. at 684. The petitioner contends that counsel's representation fell below an objective standard of reasonableness, when counsel failed to submit a timely motion to suppress of the petitioner's out of court statement.

Had counsel submitted a timely motion to suppress, there is a reasonable probability that the outcome of the proceeding would have been different, the jury would not have had before it prejudicial statements made by the interrogating officer, in which he was able to portray the petitioner in a negative way, see exhibits [ Pages 20, 25, 27. of out of court statement ].

More importantly the petitioner himself, had made incriminating statements  thus, the prosecution was enabled by counsel's ineptitude, to use the accused's out of court statement, and the statements of the interrogating officer to bolster it's case.

Wherefore the petitioner asks this court to find that he has been denied due process and the effective assistance of counsel, and that this court reverse the conviction and order a new trial, or in the alternative an evidentiary hearing.

DEFENDANT WAS DENIED DUE PROCESS AND THE
EFFECTIVE ASSISTANCE OF COUNSEL, WHEN
COUNSEL FAILED TO MEANINGFULLY CHALLENGE
THE ADMISSION OF UNNECESSARILY SUGGESTIVE
PHOTO LINEUP.   SECURED BY THE SIXTH
AND FOURTEENTH AMENDMENTS.

### STANDARD OF REVIEW
Whether counsel's failure to seek suppression
of witnesses lineup identification conducted
outside counsel's presence fell below an objective
standard of reasonableness, and whether counsel's
deficiencies prejudiced the defense.

The due process clause protects accused individuals from the
use against them of evidence derived from unreliable identifications
that resulted from impermissibly suggestive procedures. Manson v.
Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977);
United States v. Sanchez, 988 F.2d 1384, 1389 (1993).

The evidence contained in the record provides proof that
several of the procedures used during the identification process
were impermissibly suggestive, and was therefore subject matter
that should have been suppressed, due to the fact that, it was
Detective Bradford Milton, through suggestive comments and
procedures, made and used, to and before the witnesses that
produced, "a very substantial likelihood of irreparable mis-
identification," Sanchez, 988 F.2d at 1389. (quoting Simmons v.
United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed. 2d
1247 (1968).

The Superme Court in its Order stated: "The identification
procedure in the case of Funk was unnecessarily suggestive" and
trial court abused its discretion by admitting the identification
of May by Funk, no substantial prejudice resulted.   See exhibits
[Supreme Court Order No. 391, 2002 at pages 8, 9].

The petitioner asserts that clearly this was an irreparable

6

misidentification, because Detective Bradford Milton never asked
the witness to identify the shooter, instead he asked the witness
to identify James, the record further reflects that the officer
left the room, thus counsel does not know what may have occurred,
or what may have been left in plain view of the witness, therefore
counsel is unable to reconstruct what may have occurred.   See
exhibit [Page 13 of Matt Funk's statement].

In the case of the witness Matt Couch, it is only when the
officer leaves the room and returns that this witness is able to
come up with the name "James".   See exhibit [Page 20 of Matt
Couch's statement].   At trial, this witness stated that a single
photograph of the accused was shown to him, by Detective Milton.
See exhibits [Trial Transcript pages 117, 118].   This witness'
identification must be considered unreliable, Manson, 432 U.S.
at 116.   An identificaiton procedure in which only one photograph
is used is suggestive.

The record further reflects that it is Detective Milton
once again, who suggests to the witness Christopher Williams that
James May shot him, see exhibit [Page 1 of Christopher Williams
statement] the officer states the accused's name in the very
first paragraph.   Clearly the witness did not know who shot him,
thus his statement "one of them blasted me in the neck with a
gun."

The petitoner asserts that, if Detective Bradford Milton
can and did in all the previously stated instances, impermissibly
suggest to the witnesses, the identificaiton of the accused,
what was to stop the officer from suggesting the identificaiton
of the accused, to all of the witnesses?   Stern action from

trial court as well as, the effective assistance of counsel was needed. Moreover, it was clearly suggestive to ask the witness Christopher Williams, "who was the person who shot you in the Throat?" while the accused sits beside counsel at the defense table. See exhibit [Trial Transcript page 141].

The Supreme Court held in United States v. Archibald, 734 F.2d 938, 940, 943 (1984). It is obviously suggestive to ask a witness to identify a perpetrator in the courtroom, when it is clear who the defendant is; See United States v. Hill, 967 F.2d 266 (1992). Where the Court assumed without deciding that an in-court identification was impermissibly suggestive. For these reasons the witnesses identifications in the above instances cannot be considered reliable.

The petitioner asserts that the record illustrates that, Detective Bradford Milton suggested the identification of the accused in each of the above instances, and counsel's failure to challenge the identification before trial prejudiced the petitioner. See United States v. Zeiler, 427 F.2d at 1306-07; Tomlin v. Myers, 30 F.3d 1235, 1251 (1993).

The record itself demonstrates that this court must find that, "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and that the deficient performance prejudiced the defense; Strickland v. Washington, 466 U.S. 668, 687 (1984) there is a reasonable probability that but for counsel's errors the outcome of the proceeding would have been different, the identification evidence has no independent origin other than Detective Bradford Milton. This court must not allow the contin

8

continuation of counsel's errors and trial court's errors and abuse of discretions, to detract from the integrity, reliability and fairness of the proceedings, it is an accumulation of errors.

When faced with a client who has been identified in an illegal lineup, most defense attorneys would challenge the admission of any evidence related to it.  After all, a defendant "arguably... has 'everything to gain and nothing to lose in filing a motion to suppress" United States v. Molina, 934 F.2d 1440, 1447 (1991).

Wherefore, the petitioner prays that this court finds that he has been denied the effective assistance of counsel and due process, and asks this court to reverse the conviction and order a new trial, or in the alternative an evidentiary hearing.

9

DEFENDANT WAS DENIED DUE PROCESS AND
THE EFFECTIVE ASSISTANCE OF COUNSEL,
WHEN COUNSEL FAILED TO ADEQUATELY
PREPARE FOR TRIAL, AND CONSULT WITH
THE DEFENDANT. SECURED BY THE SIXTH
AND FOURTEENTH AMENDMENTS.

## STANDARD OF REVIEW

Whether counsel's performance fell
below an objective standard of re-
asonableness, and whether counsel's
deficiencies prejudice the defense.

The record is replete with counsel'e deficiencies and inadequate re-
presentation. The petitioner asserts that counsel failed to conduct an
adequate and thorough pretrial investigation of the facts surrounding the
charges against him, and was therefore unable to present a viable defense.

The record illustrates a counsel that failed to object to prejudici-
al audiotapes being played before the jury, failed to meaningfully chall-
enge impermissibly suggestive identification evidence, failed to motion
the court for redaction of prejudicial evidence, failed to file pretrial
motions in a timely manner, and failed to effectively cross examine the
witnesses against the accused.

The petitioner asserts that in viewing the Superior Court Order I.D.
# 0006015793. at pages 4,5. Defense Counsel was given the opportunity to
respond to the defendant's allegations. The petitioner asks this court to
note particularly counsel's answers, in his defense against the defendant
allegations, counsel states that, it is always at trial during the trial
proceeding that counsel is first learning of the issue that needs to be
objected to, clearly this reflects that counsel has done no pre trial in-
vestigation.

In one instance counsel states that objecting to the introduction
of medical records would have been frivolous and bad trial practice, then
in the very next instance, counsel asserts that not objecting to the admi-

10

ssion of the prejudicial audiotapes, would have been frivolous and bad
trial practice, for counsel's failure to motion the court for redaction
counsel asserts was sound trial practice,

The petitioner asserts that the trial transcripts demonstrate yet a
very different view for this court. On March 4, 2002 a photographic line-
up was entered into evidence, counsel for the defendant felt that the ev-
idence was suggestive, more importantly counsel states: " I have only
gotten to see these today and I think it's suggestive, and would ask the
court to exclude it " again, this reflects on counsel's failure to file
or motion the court at the appropriate time, and as a result the defense
has been prejudice, see exhibit [ Trial Transcript March 4, 2002 at page
54].

The record cannot be anymore clearer as to counsel's lack of pre-
trial preparation for trial, and lack of consultation with the defendant
than on March 6, see exhibits [ Trial Transcript pages 5,6,7,8,9].the
issue in question surrounds an audiotaped statement that had been elicit-
ed from the defendant after the defendant had invoked his right to couns-
el, counsel for the defense asked to have portions of the audiotape and
transcribed statement redacted, trial court brought to counsel's atten-
tion that he had been provided with the statement much earlier, and that
counsel had failed to submit a motion to suppress.

Counsel for the defense initially attempted to explain this away by
saying, that he thought the statement wasvoluntary, then he stated that
he had been limited in his visitation with his client, due to the fact
that his client was at Delaware Correctional Center, even more critical
to counsel's excuses, is the fact that counsel admits himself, that his
failure to address this issue early, was remiss on his part, counsel also
stated " it's a last minute suppression in effect, and I have only done
this once or twice in my career " see pages 7,8. of above exhibits .

11

The petitioner asserts that this court must find that he has been denied the effective assistance of counsel, and due process as a result of ineffective counsel, the petitioner asserts that there is no basis for finding counsel's actions to have been "the result of reasonable judgment". Strickland v. Washington, 466 U.S. at 690, 104 S.Ct. at 2066. The fact that counsel himself has stated that he was remiss, for not addressing issues earlier defeats counsel's as well as the lower court's arguments, the lower court's can not deem counsel's representation reasonable, absent some indication that pre trial motions to suppress woulds have been lacking in merit. United States v. Molina, 934 F.2d at 1447. There is none. and without it, the failure of counsel to bring to the court's attention in a timely manner, the constitutional violations in the prosecution's case is not the product of reasonable professional judgment.

Therefore, the petitioner contends this court must find that counsel's performance fell below an objective standard of reasonableness. and that but for counsel's errors, there is a probability that the outcome would have been different.

Wherefore the petitioner asks that this court overturn his conviction and order that a new trial commence in a reasonable time period, or in the alternative, grant an evidentiary hearing.

DEFENDANT WAS DENIED DUE PROCESS AND
THE EFFECTIVE ASSISTANCE OF COUNSEL,
WHEN COUNSEL FAILED TO OBJECT TO HEA-
RSAY AUDIOTAPES OF WITNESSES PLAYED
BEFORE THE JURY. SECURED BY THE SIXTH
AND FOURTEENTH AMENDMENTS.

## STANDARD OF REVIEW

Whether counsel's performance fell below
an objective standard of reasonableness,
and whether counsel's deficiencies prej-
udice the defense.

The record reflects that the witness William MIller, was a 17 year
old teenager, who was under the influence of alcohol and marijuana,
when he made a phone call to 911. see exhibits [ Page 11. of William
Miller's statement; March 4, 2002 trial transcript page 131 ].

Prosecution for the state entered into evidence an audiotape of
this witnesses 911 phone call, counsel's failure to object to this evi-
dence was a complete breakdown in the adversarial proceeding, because
not only did counsel fail to object to the prejudicial audiotape, but
counsel failed to cross examine the witness about this evidence.

Counsel has in essence, denied the petitioner his very basic right
to confront his accuser, this clearly would have been a reasonable as
well as, the professional thing for counsel to do, it is a constitutio-
nal right for an accused to confront his accuser, counsel's failure to
object to the prejudicial audiotape being played, has left the jury no
other conclusion, other than to think, that the prosecution has offered
irrefutable evidence, that could not be disputed, the defendant could
not overcome counsel's failure to cross examine this witness, there is
a reasonable probability that the proceeding would have been different,
had counsel at the least, cross examined this witness.

Moreover, since the witness was there in court, there was no reas-
on for the prosecution to play the audiotape before the jury, the witn-
ess could have simply testified  as to what he said on the night in

13

question, for the prosecution to put before the jury, the hysterical,
and intoxicated utterances of the witness, only served to inflame the
passions and prejudices of the jury.

The petitioner asserts that there has been an accumulation of trial
court's abuse of discretions, and counsel committed errors, that the fu-
ndamental fairness, integrity and reliability of the proceedig, has been
riddled with infection, this court must call into question, whether the
petitioner has been given the, " effective assistance of counsel, and
the fair trial " that is guaranteed by the constitution.

The petitioner has raised a colorable claim and the state courts
have not addressed the merits of the claims asserted by the petitioner,
Le v. Müllin, 311 F.3d 1002 (2002). Therefore the petitioner asks this
**court** respectfully, Would any court in the United States allow any wit-
ness that is under the influence of alcohol and marijuana, to testify
before a jury ? counsel has in essence allowed an intoxicated teenager
to give prejudicial testimony before the jury, a defendant in a crimi-
nal proceeding is entitled to effective assistance of counsel in order
" to protect the fundamental right to a fair trial " Strickland v. Was-
hington, 466 U.S. at 684.

Wherefore the petitioner prays that this court reverse the convict-
ion and order a new trial, or in the alternative, grant an evidentiary
hearing.

DEFENDANT WAS DENIED DUE PROCESS AND
THE EFFECTIVE ASSISTANCE OF COUNSEL,
WHEN COUNSEL FAILED TO MOTION FOR
PORTIONS OF THE DEFENDANT"S RECORD
TO BE REDACTED. SECURED BY THE FIFTH,
SIXTH AND FOURTEENTH AMENDMENTS.

## STANDARD OF REVIEW

Whether counsel's performance fell below
an objective standard of reasonableness,
and whether counsel's deficiency preju-
dice the defense.

THe constitutional provisions at issue in this claim include the
accused's right to testify or be a witness against himself, the accused
right to a fair trial, and the accused's right to the effective assist-
ance of counsel for his defense.

The petitioner asserts that counsel's ineptitude and lack of know-
ledge, skills and diligence clearly showed at trial, during a 3 day per-
iod in which trial court was clearly giving counsel notice that redact-
ion of portions of the evidence would have been wise, counsel failed to
act competently in this matter.

The record reflects that on March 4, 2002 trial court asked counsel,
" is there any thought that any of these crimes in the records should be
redacted ?" counsel stated: " it would be to difficult to redact it, I'm
defense counsel, I think cautionary instruction is the best we can do "
The very next day trial court once again asked, " I assume there are no
redaction issues ?" counsel stated; " not to my knowledge." counsel has
clearly caused a complete breakdown in the adverasrial process, when he
realized that he indeed should have acted in the matter of redacting
the prejudicial evidence that was in the medical records.

The petitioner asserts that it took counsel 3 day...to realize
that there was prejudicial evidence that should have been strickened fr-
om the evidence, counsel finally admitted from his mouth, " there clear-
ly is the issue of redacting " see exhibits [ march 4, 2002 trial trans-

15

cript pages 79.80,81]; [ March 5, 2002 trial transcript page 13.];
[ March 6, 2002 trial transcript pages 4,5,6.].

Given the fact that the accused had advanced his Fifth Amendment
right not to testify, and trial court had already severed the charge of
possession by a person prohibited of a deadly weapon, because of it's
ability to cause sufficient prejudice, competent counsel would have
realized the need to vigorously challenge the introduction of the prej-
udicial medical records, that contained references to elements of the
charges and allegations against the defendant.

Despite the fact that trial court gave instructions  concerning the
references contained in the medical records, the petitioner contends that
this was not enough to circumvent the prejudicial effects of the refere-
nces contained in the medical records, this was trulu a breakdown in the
adverasrial process, that tipped the scale in favor of the prosecution,
and as a result, the defendant had no way of recovering, but for this
error, and the many other errors that the petitioner has asserted and
the record substantiates, the results of the proceeding would have been
different. Strickland v. Washington, 466 U.S.  at 694, see also Cronic
v. United States, 466 U.S. at 659.

The conclusion is unavoidable, counsel's failure to exercise the
reasonable knowledge, skills and diligence of a reasonably competent
defense counsel, has clearly denied the petitioner a fair trial as well
as, the effective assistance of counsel, Wherefore the petitioner asks
this court to reverse the convictionand order that a new trial be given
or in the alternative grant the petitioner an evidentiary hearing.

CONCLUSION

Based on the evidence contained in the record, and the constitutional violation suffered by the petitioner, the petitioner asks this Honorable Court to meticulously view all evidence that it has the power to have before it, and find that the petitioner has indeed, been denied constitutional rights, and further find that the petitioner is due relief in the appropriate manner, which this court feels the petitioner is entitled to.


September 27, 2002

*James A. Mays*
James A. Mays
1181 Paddock Road
Delaware Correctiobnal
Center
Smyrna, Delaware 19977

17

# EXHIBITS

1. Witness Statement Matt Couch page 20.
2. Witness Statement Erica Bell page 13.
3. Witness statement John Lackford pages 9, 13, 16, 17.
4. Petitioner statement James Mays pages 3, 4.
5. Trial Transcript pages 31, 32, 34.
6. Trial Transcript page 51.
7. Superior Court Order I.D. 0006015793 page 13.
8. Supreme Court Order No. 391, 2002 pages 9, 10, 11.
9. Petitioner Statement ¡James Mays. pages 20, 25, 27.
10. Supreme Court Order No. 391, 2002 page 8. page 9. Listed above.
11. Witness statement Matt Funk page 13
12. Trial Transcript pages 117, 118.
13. Witness statement Christopher Williams page 1.
14. Trial Transcript page 141.
15. Superior Court Order I.D. 0006015793 pages 4, 5.
16. Trial Transcript page 54.
17. Trial Transcript pages 5, 6, 7, 8, 9.
18. Witness Statement William Miller page 11.
19. Trial Transcript page 131.
20. Trial Transcript pages 79, 80, 81.
21. Trial Transcript page 13.
22. Trial Transcript pages 4, 5, 6.

(Det. Milton leaves the room.)

(Det. Milton returns.)

Q   All right, man, I've got one other question. Um, when they went in the house, did you see them punching Billy?

A   I saw them shove him?

Q   Who did? Who shoved him?

A   Um, the tall guy. I don't know if he hit him at that time or not cause I wasn't even paying no attention. Cause I was, that was happening behind me. That's when I was like getting ready to walk out the door so I had my back towards turn them and I turned around and all I saw was like Billy got pushed or, I don't know if he got hit or pushed. And then that's when I saw James, that's when I was like, right up about to get out the door and that's when they pulled, pulled out the gun.

Q   James pulled out a gun?

A   Yeah

Q   Who's James?

A   I'm not..........

Q   Dude......James? What's his name. You know James' name.

A   James.

Q   James what?   Listen.........

A   Wait, nah.

Q   You're scared of the guy, right?

A   I ain't trying to get shot.

Q   I know you ain't trying to get shot. But you'd, you'd better tell me his name.

A   It's James.

Q   James what?

A   I don't know. I swear........

Q   Uhhhhhhh. Uhhhhhhhhh.

A   I don't know if you're going to believe me or not, but I don't know.

Q   Uhhhhhhhhh,

A   That's one thing I don't know.

A    Then he like, then he comes running back and then he jumps in my car. He like ran back to my car........and jumped in the front seat of the car.

Q    OK. Then what happens?

A    After that he was like, go, go, go. I guess he knew what was going on. He was like, hurry up, get out of here. And then once I back out of the, I had to back out of the parking spot, we were going to come back around to go to the entrance and then John and Matt, they ran into my car too. They like stopped me, you know. And I wasn't going that fast out of there cause I didn't know what happened.

Q    And so John and Matt.........

A    I mean, I did hear the gunshots but I didn't know whether, I thought they were shooting at us.

Q    When did you hear the gunshots?

A    It was like after Matt had jumped into my car. It was like maybe right a second before.......I didn't even pay attention. I didn't know it was gunshots. It wasn't really that loud, to me. I didn't know...............

Q    I'm not saying that you're lying to me but here's what I am going to say to you. That it is imperative and very important that you be as honest with me as possible so that you can show to me and others that you have nothing to hide. If at any point in time I find that you are lying to me, then that tells me that you may have had something to do with this. You may have had some, um, preparatory things to do with this. If you did, now is the time to tell me. I need, I need.....just listen to me, I need to know the whole truth and now is the time in the night to tell me. Not once we're done here that I find out that you knew more when you drove the car and you sat there and waited for them to come back. Cause then it'll start to look like you were a getaway car, if you get what I mean? OK? But that, and that's why I keep asking you what was the conversation that was taking place at your house because if two carloads are going over to buy weed........

A    Well see that's what they were talking about, there was a party. Cause even my cousin, he's like, oh there's some pointy heads over there. And I, you know, waited until like they told me to come in or something, that there was a party.

Q    Uh-huh. Now I'm hearing you go into the party and I'm hearing everybody gets out of the car and I'm hearing that you, you're sitting in the car by yourself.........

A    Plus I didn't know the two people that they were going to see either.

Q    What do you mean?

A    I didn't know the people they were going to see, so I'm not going to go, I usually don't party with people I don't know. Plus I had my son at home. I was just going to go back home. If they decided to stay and party, I was just going to leave.

Q    But you were sitting there for 15 minutes. How long were you going to wait?

A    Actually I had already went back to my house, got my cigarettes, came back to see what they were doing and then that's when I caught up back with them. After one guy parked back and, you know, and then Matt came back out. I must have been parked back there like five minutes after

A   Basically.

Q   What did you ran for when you saw the police around the area?

A   Oh, I had warrants. That's, see, because I always tell my girl, I said, look, if I get pulled over driving, I'm gonna run because we have intentions of paying the ticket, it's just like, we're really in some hard times right now. We're trying to get a place and all and she's starting.......

Q   Let me get back to the place. Jay said he was taking the pit bull. Why did he say he was going to take the pit bull?

A   I don't know. I have no.........

Q   What were they doing.....when you came in the back door.........

A   When I came in the back door, they were fighting.

Q   Who was fighting?

A   I don't know. I just saw some........Matt Funk said, shit, they're fighting and all. When I walked in there, they were standing face to face. Well, the two guys over there and the them over there. And I come in through the door, I said, what's up? And I started walking out the door cause they.......

Q   Let me ask you a question. Do you live there?

A   Where?

Q   That house?

A   Watersedge? No.

Q   Did you have any right just to walk in them people's house?

A   No, but it's, it's, kind of like, I had to, I don't know, it was in my mind, and plus I was drinking and all. It was in my mind that I had to defend.......

Q   ....your friends.

A   Yeah, pretty much. Kind of, like that, I'm saying. I mean, I, well, you're a cop and all and you've got to show loyalty to the other cops, you know what I'm saying? The loyalty factor thing.

Q   Not if they're doing something illegal.

A   Well I didn't know there was going to be shooting or anything like that. All I know is they were going to buy weed and, boom-boom. The next thing I know I'm running and I see 20 million cops. And that's when I ran because I knew you guys were going to question me but I didn't want to get arrested for the tickets and all. So, I just was walking around the neighborhood for about an hour and the next thing I know I called Terry, that's Erica's mother, or Erica's aunt and she said that they had Erica and Matt here and they want to talk to me about, they just want to question me. And I'm like, OK. So that's when I picked up the phone. I was like, well I might as well get it done

A    Uh-huh

Q    I mean, I didn't come in here and try to play no mind games with you and stuff.

A    Oh, I know.

Q    I'm taking you down for shooting.............I ain't talking to you like that.

A    No, I understand.

Q    Like dude, like dude, straight up. I've got a feeling, I'm pretty sure that you didn't shoot nobody.

A    Oh, I didn't.

Q    We start right in there, and that should let you know, that ain't trying to come in here and slam you with nothing. All right?

A    All right, well I can give you a name. I can't give you the gun or an address. He said he moved out and everything.

Q    What's his name?

A    James Mays

Q    And where is he from?

A    Wilmington, I guess.

Q    Where did he used to live?

A    For about two months right across the street from me. Prices Corner. Well not across, across the highway in another development.

Q    What development did he live in?

A    Oh man, I can't think of that development. It's across the street from I. Goldberg.

Q    What do you know him from? How do you know this guy?

A    Oh, I met him one time working at the car wash. Long time ago. Long time ago.

Q    You all have been friends ever since?

A    Uh-huh

Q    How do you guys hang out?

A    Hardly.

Q    I mean, but what made him come around you today?

A    We usually, every Sunday we usually get together and have a barbecue. And we get they rolled

Q    How do you know that?

A    At least that he told me tonight.

Q    Who was he living there with?

A    I don't know their names. Sam something. He used to live there with them, rented a room out from 'em.

Q    Is it an older guy?

A    Yeah

Q    Can you show me where it's at?

A    Right now?

Q    If I wanted to go over there, could you show it to me?

A    I don't have to go to the house or nothing, do I?

Q    Uh-uh. All right, so.........Matt calls this guy. Did you know these guys?

A    Matt didn't call them. They just stopped down.

Q    No, no, no, no, no. To go get the weed.

A    Oh, no, I don't know these guys. This, this is the first time I've ever seen 'em.

Q    So who suggested that you get the weed from these guys?

A    Huh?

Q    Who suggested that you get weed from those guys?

A    Matt

Q    How did Matt know these guys?

A    I don't know how Matt knows them. Just, one time this guy got shot and the one that has all the weed got busted with 15 pounds and attempted murder and there was no more weed, then all of a sudden this guy pops up. I don't ask where it comes from. I hardly smoke it myself because I got, I got a charge on me, which I don't really think is going to help me as far as this. So that's, that's why I was asking you what kind of charges I get cause I've got a Class G felony for carrying a concealed deadly weapon.

Q    What did you have a gun? For what?

A    Basically it's, it was in my girlfriend's name. It's for protection use. And I had just bought hollow points for it and we were going to go off shooting it. We got a place where we go up and shoot it cause I teach her how to aim, how to get the accuracy and all that.

**Lackford, John - Case No. 32-00-066857 - Det. Bradford Milton**
**Page 17 of 19**

Q    Is this a range or is this just in the woods?

A    Just, just in the woods.

Q    Hollow points?

A    Huh?

Q    Hollow points. That's real safe.

A    And, uh, I was all drunk one time and, I know you won't believe me, but I'll say it anyway, I forgot I had it in my pocket.

Q    Uh-huh

A    I had this big ass heavy leather jacket on that you cannot tell it's in there cause it's a lightweight gun. And somebody else was stealing a pack of cigarettes, and me being drunk, I think I'm invincible, you know, so I started stealing a pack of cigarettes and the next thing you know, security picked me up. I tried my damndest to get out of it. I said, I'll give you willful content, give you everything back, I'll leave the store and everything like that. He said, no, we've got to search you and that's when he pegged me for it. I went to my first court appearance I got to wait until my final court appearance July 3rd. That's why I'm saying, that's not going to look too good, is it?

Q    Right. No, anytime you get arrested. But that's not something that's going to bother me, all right?

A    Uh-huh. But I'm saying, that's what I wanted to know, if I was catching any charges from this that..........

Q    There aren't any warrants for you. I don't have any warrants for you but that doesn't mean that there won't be but right now, as we're talking, as me and you are sitting here at 5:50 in the morning, I have not done an arrest warrant for you. All right? Now, the reason that we went over your rights is because that's not impossible that it won't happen. All right? You understand that?

A    Uh-huh

Q    OK. I want to make sure that you're clear on that.

A    Yeah

Q    Um, so, you know, relax on that for right now. I've still got some things to sort out.

A    I still got to take care of those warrants.

Q    James May

A    Uh-huh

Q    Who's, who's Wright?

A    Wright?

Q    Yeah. Who's James Wright? Or White?

A    Yeah

Q    Do you know military time?

A    No. That's probably like one though, right?

Q    Right. It's a 24 hour clock. Instead of like 2:12, you've got 00 and then it goes to 24 and 0001 is like 12:01.

A    OK

Q    It's a more efficient way of telling time, man. All right. OK. First thing we're going to do.....I know you anxious to find out why I want to talk to you, all right?

A    Right?

Q    I'm anxious to talk to you. You've been arrested before, right?

A    Right

Q    So one of the first things we got to do is since you're in custody, obviously, um, is we need to go over your Miranda warnings, all right? Can you read, write?

A    Not too much. My reading and spelling, it's not too good.

Q    It's not too good. All right, well I have a form. We have Miranda warning on a form. So what I'm going to do is I'll read them real slow and if there's anything you don't understand, you let me know. OK?

A    Right

Q    All right. You do have the right to remain silent. OK? Do you understand that?

A    Uh-huh

Q    Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you're being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish one.

A    Can I call my lawyer?

Q    Is that what you want to do?

A    Yeah

Q    OK. All right. So..........what I need you to do is check, well......

A    Do you understand.......

Q    Right, do you understand these rights I've explained to you?

A    Yeah

Q    OK, and having these rights in mind, do you want to talk to me now?

A    Yeah, we can talk all night.

Q    Well we can't talk if you want to call a lawyer, then you've got to call...if you want to call a lawyer before you talk to me, is that what you want to do?

A    I want to know what's going on from you before I speak to my lawyer. I want to know what's going on so I can explain what's happening to him.

Q    Well, it can't work that way. Me and you either talk, have an open discussion with each other or you make the decision not to talk to me and talk to your lawyer first, which is your right.

A    So until he get here, I won't be able to know what's going on.

Q    Well, A, I'm not going to talk to you with him. We just, we just won't talk right now. All right?

A    Right

Q    Maybe, you know, if you talk to your lawyer and you and your lawyer decide you all want to get in touch with me and talk at a later time, then that's your right. I ain't, I ain't gonna mad at your either way. You know what I mean? It's your decision.

A    Right

Q    You know, you make that decision. So if you don't want to talk to me before you talk to a lawyer, then that's your business. That's what you want to do. But if you want to talk to me........

A    I just want to let him know what's going on, you know what I mean?

Q    He'll find out soon enough. Lawyers know how to find out stuff. But, you know what I mean?

A    Uh-huh

Q    So, is that your decision? You want to talk to a lawyer first?

A    I mean, I can talk to you, then talk to my lawyer?

Q    You can talk to your lawyer any time you want to.

A    Right. That's what I'm saying. So I can speak to you and then like if it's something I don't want to talk about or something.......

Q    Well if you speak to me, we're going to go over, we'll go over your rights again. All right?

A    Right

Q    And, you know, make sure that you understand them and then you've got to tell me that having those rights in mind, you still want to talk to me, before you talk to your lawyer. You've got to make that decision. You talk to me first or you talk to your lawyer and then you all make a

29

1  what's going on. I mean, if it's something that I
2  feel -- I feel as if it is going to mess me up or
3  something then I'm going to stop talking, you know
4  what I mean?" At that point my client's will has been
5  worn down, and the police take a statement.
6      We would submit this is clearly a case where
7  they should have stopped questioning, and we submit
8  that the questions which were asked in the four or
9  five segments that I just read do not constitute
10  clarification under Thompson V. Wainwright, which is
11  cited in Crawford, and we submit that the pointed
12  question should have been, "Do you want counsel?" It
13  was never asked in that direct way, except the first
14  time when my client denied it and indirectly my client
15  indicated he wanted counsel twice.
16      THE COURT: I may be misrecollecting your
17  position that you stated yesterday, but I thought the
18  grounds for oral suppression were improper
19  clarification, not that there was an unequivocal --
20      MR. FACCIOLO: I think I indicated it was
21  arguendo. But either way I think it stands.
22      THE COURT: Mr. Letang, in response?
23      MR. LETANG: Your Honor, I don't want to

30

1  belabor this point. I had recessed to go back and
2  look at Steckle and Crawford and Draper, and in
3  reading these four or five pages of transcript the
4  State's position is that this doesn't even approach
5  Draper.
6      If one is to sit back and read this what
7  apparently was taking place is the defendant, when the
8  officer appropriately was advising him of his Miranda
9  rights, had indicated it appears that he wanted to
10  know what the police knew about this and then he was
11  going to consult with counsel if he thought that was
12  appropriate.
13      On a number of occasions in this case, I
14  didn't count them, but I would say probably four times
15  that the officer takes a run at reading him his
16  rights. At no time is there an attempt to, as I read
17  it, to overbear anyone's will. As a matter of fact,
18  he tells the defendant on a number of occasions, Look,
19  I'm not talking to you. Well, it doesn't work that
20  way that an officer is going to give a speech to a
21  defendant. It is a give and take, and this looks
22  like, apparently, the defendant was desirous of having
23  the officer speak, and then the defendant was not

31

1  going to return speaking, and the officer purposely
2  said that's not the way we do it. If you want an
3  attorney here an attorney can find out the information
4  you are seeking, and when it is all said and done the
5  defendant says, well, this is what I want to do. I
6  want to talk to you, and he says if I want to stop
7  talking I'm aware of that, and eventually what he does
8  is he says, okay, I'm done talking, and I would like
9  to consult my attorney.
10      So I don't think in looking at those case law
11  that the Draper situation, for example, the boy the
12  entire time never varied from his request to talk to
13  his mother. I mean, there was never a variance there.
14      THE COURT: What about the question and
15  answer at the bottom of Line 3 where the answer is
16  quote, "Can I call my lawyer?"
17      "QUESTION: Is that what you want to do?
18      "ANSWER: Yes."
19      Mr. Facciolo argues that that's an
20  unequivocal, unambiguous invocation of right to
21  counsel.
22      MR. LETANG: But you have to keep reading.
23  He does say that, and he goes back. He doesn't at any

32

1  time say you can't do that or if you want information
2  from me I would provide information to you, but I
3  can't do that if you want a lawyer here. There's
4  never any of that colloquy engaged in.
5      THE COURT: What does case law say about
6  ability of a Court to look at post invocation
7  statements in order to clarify what they mean? Stated
8  another way, am I allowed to consider what occurs
9  after the statement of the defendant, "Can I call my
10  lawyer? Is that what you want to do? Yes." To what
11  extent am I allowed to consider what happens
12  afterwards to determine whether or not that statement
13  alone was equivocal or unequivocal?
14      MR. LETANG: I can't answer that question
15  because I don't have the case law, but I think you
16  have got to look at the big picture as to what
17  transpired here. I don't think there's any question
18  whatsoever. The defendant was on an exploratory
19  mission to try to find out what the police knew. And
20  was he aware of his rights? Absolutely.
21      I mean, if you look at the end of the
22  transcript he then says, "Okay. I am now done? I
23  want to talk the my lawyer," but he announces -- he is

33

1  the one who is trying to control and set the tone for
2  how the interrogation is going or the statement is
3  going to take place, and the officer says, "I can't do
4  that." So I don't think you can take one sentence out
5  of this. I think you have to look at all four or five
6  pages, as well as the end of the tape and see what his
7  response was.
8      THE COURT: Anything in brief response, Mr.
9  Facciolo?
10     MR. FACCIOLO: Yes. I think the context
11  overall is taking into account if you don't feel there
12  was an unequivocal calling of counsel, and I think the
13  answer yes to the right of counsel in our language is
14  unequivocal. If the Court rules that that's not
15  unequivocation at that point only then I suggest to
16  the Court should the Crawford analysis come into play.
17     THE COURT: I think I understand your
18  position. We'll take a short recess right now. If I
19  uphold the State's position I assume we'll go to the
20  testimony about the State. If I want to reserve
21  decision the State could potentially be prepared to go
22  with its witness it wanted to call before noon and
23  just interrupt the testimony of Detective Milton.

34

1      MR. LETANG: I just want to get the witness
2  on before the lunch recess. There are questions I can
3  ask Detective Milton, but if the Court sees it the
4  State's way maybe we won't have that problem.
5      THE COURT: We'll be in recess.
6      (Break taken.)
7      (State's Exhibit No. 39 was admitted into
8  evidence.)
9      THE COURT: Counsel, what I would like to do
10  preliminarily is to listen to the tape at least on
11  Page 3 where the exchange begins, quote, "Can I call
12  my lawyer," end quote is said because -- well, I just
13  want to hear it.
14     MR. LETANG: Let me get a copy of that.
15     THE COURT: While we're waiting, may I see
16  counsel at side-bar? I'll go right to the court
17  reporter.
18     (The following side-bar discussion was had:)
19     THE COURT: I'm just going to say this
20  privately in the interest of civility and not to
21  unduly embarrass you, but this absolutely should have
22  been brought up earlier.
23     MR. FACCIOLO: Your Honor, I can't respond

35

1  because it deals with the client/lawyer relationship,
2  but I wish I could have brought it out earlier.
3      THE COURT: But you were provided with the
4  statement much earlier, were you not?
5      MR. FACCIOLO: Yes, and I stated all that I
6  can previously on the record because --
7      THE COURT: As an officer of the Court that's
8  a sufficient response.
9      MR. FACCIOLO: I understand. This has
10  happened twice in my life.
11     THE COURT: But it's just not right to
12  interrupt a trial for a suppression hearing. But I'm
13  going to allow it to be done under the circumstances,
14  but I wanted to take a step at side-bar rather than
15  publicly.
16     MR. FACCIOLO: I appreciate that, but this is
17  just a difficult case, and my client and I have
18  disagreed from time to time on this case.
19     THE COURT: All right. We'll resume when we
20  can. End of side-bar.
21     MR. LETANG: I believe we're still on the
22  record. I have got the tape, which is what I think
23  the Court wants to hear, and I don't know -- I have

36

1  not played this copy yet. The defendant is not yet in
2  the courtroom anyway. I assume -- should he be in
3  attendance for this?
4      THE COURT: Yes. May as well. On
5  scheduling, I really need to take lunch from one to
6  two because there's a 1:30 meeting I need to attend.
7  And, of course, we have to recess at 10 minutes of
8  four.
9      MR. LETANG: I'm not playing this. This is
10  only a test.
11     THE COURT: Actually, I think it would be
12  helpful for me to hear the statement from the
13  beginning. It's not that long, so I'll plan to do
14  that.
15     MR. LETANG: Okay.
16     THE COURT: Counsel, as I stated, I want to
17  hear the tape at least from the beginning of the
18  statement through the bottom of Page 3. I may have
19  wished to go further, but at a minimum through Page 3.
20  So I guess the tape should be marked at a later time
21  as a court exhibit for now, and if it should come into
22  evidence it would be marked as an exhibit of the
23  State.

**49**

1  Crawford versus State 580 A2d 571 where it is said,
2  quote, "Where a suspect does not unequivocally invoke
3  that right the police should be entitled to attempt to
4  determine the suspect's intention. If, however, the
5  police make additional inquiry regarding a suspect's
6  intentions, the clarifying questions may not coerce or
7  intimidate the suspect or otherwise to discourage his
8  efforts to secure counsel if that is his intention,
9  nor may the police tender any legal advice or attempt
10 to dissuade the suspect from pursuing an intended
11 course."
12      Skipping a sentence, "The clarifying
13 questions or a repeated Miranda warning indicate that
14 the suspect does not wish the assistance of counsel
15 the interrogation may continue." And that's what I
16 find happened in this case. I think Detective Milton
17 was very conscientious in his limiting of questions to
18 clarification of the issue of whether or not the
19 defendant truly wanted an attorney or if he didn't, as
20 was indicated by his change of mind when asked to sign
21 the box.
22      I won't read all of the exchange because it's
23 a court exhibit, but, essentially, the questions are

**50**

1  mostly found on Pages 4 through 7 of the statement,
2  but, for example, on Page 4 Detective Milton says
3  toward the top, "Well, we can't talk if you want to
4  call a lawyer. You have got to call. If you want to
5  call a lawyer before you talk to me, is that what you
6  want to do?" The detective to his credit focused on
7  whether or not the defendant really wanted a lawyer or
8  not, and there are many other questions back and forth
9  to that effect.
10     I do think it was important to the defendant,
11 also, that he be able to stop making a statement if he
12 wanted to do so. On Page 5 the question is asked
13 again, "If at any time during this interview you wish
14 to discontinue this statement -- you wish to answer,
15 right?" That's what I'm talking about. The detective
16 says, "You want to stop now we can leave." I think
17 the detective was thorough in determining the
18 intention of the defendant, and it's clear to me that
19 after the exchange was completed on Page 7 that the
20 defendant did not invoke right to counsel, was willing
21 to waive that constitutional right that was explained
22 to him and to which he testified that he understood.
23     I will also say that one of the reasons I

**51**

1  think a form is probably appropriate to use was that
2  the defendant on Page 3 indicated he was not good at
3  reading and spelling, which is all the more reason, I
4  think, for the care to be taken. So I don't find that
5  in asking that particular question two that he signed
6  the box as he had just said amounted to a reassertion
7  or reeffort to get interrogation going when the
8  defendant had expressed an interest to cease.
9      So for all those reasons the motion is
10 denied. It's denied also on the independent basis
11 that the defendant's right to move for suppression of
12 the statement was waived because it wasn't filed in
13 the pretrial manner pursuant to the New Castle County
14 criminal case management order, but I was willing to
15 hear it at mid trial, but it is it is denied for both
16 those independent reasons. Now, it took more time and
17 it diverted us from the trial, but it was an important
18 issue, and I resolved it.
19     MR. LETANG: I understand that. What I have
20 done is I have taken -- if the Court would turn to the
21 last page of the Page 27 it is the second to last page
22 of the transcript. I have made transcripts last night
23 and had my secretary delete everything after the

**52**

1  reference, "I'm not afraid of nothing. I don't -- I
2  don't -- I have nothing you're asking me, and I'm
3  telling you what I got to say."
4      THE COURT: I think, as we discussed
5  yesterday, that will be redacted. Mr. Facciolo, are
6  you in agreement?
7      MR. FACCIOLO: That was agreed.
8      THE COURT: What about the exchange on Page 3
9  in the middle where it said, quote, "You've been
10 arrested before, right?" Answer, "Right." Is that
11 anything that should be redacted? I've heard no
12 request made to redact it. Is there some reason the
13 defense did not redact that?
14     MR. FACCIOLO: We take no position on it, so
15 we're not requesting it be redacted.
16     THE COURT: Hearing no request it be redacted
17 it will not be redacted.
18     MR. LETANG: My plan is, your Honor, I was
19 going to attempt to bring Mr. Branch on. I didn't
20 want him to stay through the recess, but given the
21 fact that he has to come back anyway I think what I
22 would like to do is have the detective come back on
23 the stand, ask him more questions, we can recess

09/07/2006  13:26    2552265    PROTHONOTARY NCC    PAGE  14/15

was reasonable and that the defendant should fully cooperate if he 'had nothing to hide.'"[37]   The Delaware Supreme Court, in Defendant's direct appeal, spoke at great length as to Defendant's statement and the untimely motion to suppress.  The Court held that although after Defendant had requested an attorney all questioning should have stopped, and that the statement that resulted from further questioning was admitted in error, there was no prejudice from such error "because the statement, although taken without the presence of counsel, was essentially exculpatory."[38]  Therefore, as the Delaware Supreme Court found that there was no prejudice, Defendant can not satisfy, and has not done satisfied, the prejudice prong of a claim of ineffective assistance of counsel.  Thus, Defendant's sixth ground for relief is **DENIED.**

15.    Ground seven of Defendant's petition focuses on Defendant's claim that trial counsel did not adequately prepare for trial by meeting with Defendant. Defendant's claim is completely conclusory as it does not set forth any concrete facts from the record in support of his allegation.[39]  Thus, ground seven is **SUMMARILY DISMISSED.**

---

[37] Def.'s Memorandum in Supp. of Pet. 8.

[38] *Mays v. State,* 2003 WL 231615, at * 5.

13

(23)   For this Court to find plain error there must exist a substantial amount of prejudice to Mays.[14]   A substantial amount of prejudice does not exist here. Although Funk's identification should not have been admitted, his was one of several identifications made by witnesses.  The identification of Funk alone was not enough to cause prejudice to Mays in light of all the other identifications properly admitted.

(24)   Accordingly, although the trial court abused its discretion by admitting the identification of Mays by Funk no substantial prejudice resulted.  Accordingly, no plain error exists.

(25)   Mays next contends the trial court erred by not suppressing his statement to the police because he invoked his right to counsel but the police continued to question him.  This Court reviews the trial court's admission of evidence for an abuse of discretion.  If the Court finds that the Superior Court abused its discretion, this Court will then determine whether the mistakes constitute such significant prejudice that they denied the appellant a fair trial.[15]

(26)   This Court has held that, "once an accused in custody expresses a desire to deal with police only through counsel, he 'is not subject to further interrogation by the authorities until counsel has been made available to him' unless there is a

---

[14] *Wainwright*, 504 A.2d at 1100; *Barriocanal*, 697 A.2d at 1171.

[15] *Barriocanal*, 697 A.2d at 1171.

9

valid waiver of his request for counsel."[16]  In other words, where a suspect makes

an explicit request for counsel, the police must refrain from further questioning until

counsel is provided or the suspect himself initiates further conversation.[17]

(27)    The trial court's inquiry into a request for counsel consists of two parts.

"First, the court must determine whether the defendant actually invoked his right to

counsel.  Once this determination is made, further statements by the defendant are

admissible only if (a) the defendant initiated further discussion, and (b) the defendant

knowingly and intelligently waived the right to have an attorney present."[18]

If the court determines that the defendant did not unequivocally invoke his

right to counsel the police are permitted to attempt to determine the suspect's

intentions by repeating the *Miranda* warnings as a means of emphasizing the

suspect's right to counsel.[19]  If the police do make additional inquiries, these

questions cannot coerce or intimidate the suspect or otherwise discourage his efforts

---

[16]*Wainwright,* 504 A.2d at 1101 quoting *Edwards v. Arizona,* 451 U.S. 477, 485-86 (1981).

[17]*Crawford v. State,* 580 A.2d 571, 574 (Del. 1990).

[18]*Id.*

[19]*Id.* at 577.

10

to obtain counsel.[20]  Once the clarifying questions are answered and the suspect indicates he does not wish to obtain counsel, the interrogation may proceed.[21]

(28)   At the beginning of Mays' interrogation the officer began to read Mays his *Miranda* rights.  After stating, "If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish one," Mays responded, "Can I call my lawyer?"  The officer then asked Mays, "Is that what you want to do?"  Mays responded, "Yeah."

After Mays' response the police officer then asked Mays if he understood the rights explained to him.  Mays responded that he understood.  The police officer then asked, "OK, and having these rights in mind, do you want to talk to me now?"  To which Mays responded, "Yeah we can talk all night."

(29)   Mays gave an unequivocal request for counsel.  After he told the officer "Yeah" he wanted an attorney, questioning should have ceased.  Although the officer asked clarifying questions these questions are only necessary where a suspect's request is ambiguous.  Mays' request was clear.  Therefore questioning should have ceased and Mays should have received an attorney.

---

[20] *Id.*

[21] *Id.*

11

A    Uh-huh

Q    You understand that?

A    Right

Q    Now the only thing we got to figure out is, and the thing I want you to help, remember I said I've got questions that I need answers to....I don't know what's going on inside of your head. I can't explain that. I don't know if you planned for two weeks to go and shoot somebody or if, if, if something accidental happened or, or what. I need to know those kind of things because those are important things. When I sit down and I start reviewing this case with the prosecutors, I mean, it's not a game. This is serious.

A    I know.

Q    And I sit down and I review it with the prosecutors and we start to make our determinations on this case, there's questions that I have to be able to answer. Some of them are, what was this guy thinking? You know? Is he sorry that it happened, you know? Does he even care. Was it an accident? You know? Accidents happen all the time.

A    No they don't.

Q    Yeah, they do. Accidents happen all the time and you know that. You know?

A    No I don't.

Q    In an instant, man, you can be in a situation where you were somewhere, something went down and, bam, all of a sudden, everything just, shit just went bad because of one little mistake. You know what I mean? One little mistake and everything just changed all of a sudden. Somebody gets hurt. And then, you know, I come through to clean up the mess. You know what I mean? That's what I do. That's my job. So I'm in a situation where I got somebody shot, right? I've got information that tells me, hey, here's the man that shot him. You know what I mean?

A    Right

Q    Over there with a gun, you know, and can........

A    Over where I was?

Q    Huh?

A    I was there with a gun?

Q    I'm asking you. I'm asking you. I'm telling you, I'm telling you, OK, I'm telling you that my investigation says that you were the one there and that you, you know, shot the guy. Now, what I can't tell you is, was it an accident, did you mean to do it, was you trying to take him out, you know what I mean? I don't know the intent. I don't know the level of the commitment to the crime. Something happened. Now the only person that can clear this up for me and make me understand what was going on inside your head, is you. I'm not no, you know, I'm not no mind reader. I'm not, I don't have no secret powers that I can go and look in your eyes and be able to tell, you know, what you're thinking, cause I can't. You know what I mean? I can't do it. But I also

said that. We pulled a gun out on her and then the whole thing came down to the junkie just was trying to get weed and borrow some money or something so she can get some drugs.

Q    Let's look at that scenario.

A    Right

Q    You've got one junkie.

A    Right

Q    Your word against one person.

A    No, it was more than one. It was more than one.

Q    More than one junkie?

A    She had a boyfriend, yeah.

Q    They were all in on it? Well I got a guy that got shot so I know something happened.

A    Right

Q    That ain't even an issue with my case.

A    Well how that got to do with me, though? You know what I mean? People get shot every day. That don't mean that I'm the one that's doing it. You know what I mean? What guns do I got though? I don't even own a gun.

Q    You don't have a gun right now.

A    I don't own a gun.

Q    You might get to one.

A    No, I'm not into that type lifestyle, man. All I want out of life, man, is my kids, you know. That's all I want.

Q    So you've never been involved with anything involved with a gun?

A    No. I mean, I had previously, to protect me and my girl and my family, but all I want is my kids. That's all it is.

Q    Well how bad do you want that? I mean, are you willing to sit here and be uncooperative with me and……..

A    I told you what I had to say.

Q    And have me, I'm saying, and have me, I mean, right now I'm thinking, you know, OK, here's this guy just shoots this guy. You know what I mean? He cold blooded. He's a cold blooded dude. Or does he, or does something else happen? You know, I mean, did something happen? Did the guy grab the gun, did something, what else, what happens? I don't know. And if you, if you lead

Q    I don't want you to tell me.......

A    I'm not afraid of nuttin, though.

Q    All right,

A    I'm not afraid of nuttin'. I don't, I don't, I have nothing, you're asking me and I'm telling you what I got to say.

Q    So me telling you that, you know, I have evidence against you......

A    I just got to speak with my lawyer. If my lawyer can't do nuttin' I guess......

Q    So you want to talk to the lawyer?

A    Yeah

Q    All right. All right. Well, we're done talking, all right? And I'll let you talk to a lawyer. OK?

A    Uh-huh

Q    And your lawyer, you and your lawyer decide you want to show some remorse and talk to me, then.......

A    I have no remorse to show though, that's what I'm trying to say.

Q    All right. You don't seem too concerned, man.

A    Concerned about what?

Q    This.

A    I'm not.

Q    Why? You don't care?

A    It's not that I don't care. I know that's just my word against everybody else's word. That's all it is.

(21)    With respect to witness Funk, Mays did provide proof of impermissible suggestiveness. Funk was one of the last witnesses to identify Mays. He had only met Mays on one or two other occasions and even then for only a brief period. During the course of Funk's identification the officer stated to him:

> I'm going to show you two line-ups and then I'm going to show you some pictures of a car. I'm sure you'll be able to pick the car out . . . . I'll let you look at the pictures. . . . I know you know James, so that should be the easy one. We'll get it out of the way first. . . . You can tell me whenever you see him.

(22)    The identification procedure in the case of Funk was unnecessarily suggestive. Particularly problematic is the statement, "I know you know James . . . . You can tell me whenever you see him." The officer should have asked Funk to identify the person who shot Williams. Instead he asked Funk to merely identify Mays' picture. Furthermore, there existed a likelihood of misidentification because the officer asked for Funk to identify Mays and not the person who shot Williams. Although the State argues that the officer's statement was permissible because Funk had previously identified Mays as the shooter, this does not alleviate the fact that the procedures used in the identification were unnecessarily suggestive and increased the likelihood of a misidentification. It appears the trial court abused its discretion by admitting the identification of Mays by Funk into evidence. This, however, does not end the matter.

8

**Funk, Matt - Case No. 32-00-066857 - Det. Bradford Milton**
**Page 13 of 16**

A      No, I did not.

Q      They left in their car?

A      Yes they did. I know that Matt, Matt Couch told me that he called from Edgemoor, either a pay
       phone or Edgemoor, somewhere around that place, and an officer picked it up and knew his
       voice.

Q      Who?

A      The officer picked it up and whenever James called back on the pay phone for Edgemoor.

Q      He called Matt's house?

A      He called Matt's house that night right after it happened. I guess that's where he fled to and they
       used a pay phone to call Matt's house and Matt said the cop was already there looking at his
       caller ID so when he picked it up, he answered and the cop knew his voice. I mean, I don't know
       if you knew that. But that's what Matt told me.

Q      I've got to find out about that. All right hold on, let me, um, go answer this page and then I'm
       going to show me pictures and then we'll be done. OK?

(Det. Milton leaves the room.)

(Det. Milton returns.)

Q      Sorry about that. I had Billy's father bring him in and they were on the way out of town so I just
       had to show him the line-up.

M      Is he still out of the hospital.

Q      No, no, there's two guys.

M      Oh

Q      No, he's not the one who's shot. Let's get back to the book that me and you were in. I'm going to
       show you two line-ups and then I'm going to show you some pictures of a car. I'm sure you'll be
       able to pick the car out. Mom, why don't you slide your seat back. I'll let you look at the pictures.
       Now just take your time. I know you know James, so, that should be the easy one. We'll get it
       out of the way first. All right? You can tell me whenever you see him.

A      #2

Q      Huh?

A      #2

Q      Is that the one?

A      Yeah

State v. James Mays                                                    03/05/2002

Page 117

Matthew Couch - Redirect

1)  ask to refresh his recollection, Your Honor?
2)        THE COURT: Yes.
3)  BY MR. LETANG:
4)        Q. This is the question and answers again from
5)  Detective Milton to you, and I'll show you what it
6)  says under answer. And he had pointed the gun. And
7)  you said, uh-huh. And then the question was, uh-huh.
8)  And the answer was: It was -- I was standing right
9)  here getting ready to walk out the door. And right
10) when I was about to walk out the door I heard a
11) gunshot and it hit him. And then I heard another one
12) and I guess it hit him too, and then they just
13) started to run out the door.
14)       So your testimony at that time -- or your
15) statement to the police was, you believe the first
16) shot did hit him, and the second shot you believe hit
17) him, but maybe not?
18)       A. I really don't know what shot actually hit
19) him. I know there was two shots fired at him.
20)       Q. Okay. Last question, Detective Milton saw
21) you on the 21st. Did he show you -- June 21st. Did
22) he show you a photograph --
23)       A. Yes.

Page 118

Matthew Couch - Recross

1)        Q. -- of the defendant, Mr. Mays?
2)        A. Yes.
3)        Q. And did you identify that photograph as
4)  being Mr. Mays?
5)        A. Yes.
6)        MR. LETANG: Thank you. No further
7)  questions.
8)        THE COURT: Mr. Facciolo, why don't you
9)  take what time you need.
10)       MR. FACCIOLO: I certainly think that my
11) two questions will be shorter than Mr. LeTang's two
12) questions.
13)       THE COURT: All right. Go ahead.
14)       RECROSS EXAMINATION
15) BY MR. FACCIOLO:
16)       Q. I had asked you previously if you may have
17) known James from going to his apartment, and you had
18) said no.
19)       Do you remember ever meeting James before
20) when he may have gone to either Erica or John's for
21) any events, prior to this incident?
22)       A. Erica or John?
23)       Q. Yes.

Page 119

Matthew Couch - Recross

1)        A. Erica was living at my house.
2)        Q. Erica or John.
3)        A. John was living my house too.
4)        Q. Not the whole time?
5)        A. Oh, yeah, Erica used to live in an
6)  apartment, because Erica didn't really know John at
7)  the time that she had an apartment. She was just
8)  getting out of a relationship with her old boyfriend.
9)        Q. So you didn't know James before in that
10) fashion; correct?
11)       A. Nope.
12)       Q. And, finally, you have never been charged
13) with any criminal crimes of any kind as a result of
14) this particular event; have you?
15)       A. No.
16)       MR. FACCIOLO: No questions further. Thank
17) you.
18)       THE COURT: Mr. LeTang.
19)       MR. LETANG: No further questions.
20)       THE COURT: Then you may step down.
21)       MR. LETANG: I ask also that he be excused.
22)       MR. FACCIOLO: That is not a problem.
23)       THE COURT: Then you're excused from

Page 120

1)  further testimony in this trial.
2)        Let me meet with counsel very briefly on
3)  scheduling before we officially begin our recess.
4)        (Sidebar discussion, off the record.)
5)        THE COURT: Members of the jury, we're
6)  going to take about a ten minute recess, and then get
7)  in about 35 minutes of testimony before 5:00 o'clock.
8)  Please take out the jury.
9)        (The jury left the courtroom at 4:16 p.m.)
10)       THE COURT: We're in recess for about ten
11) minutes.
12)       (Recess taken.)
13)       THE COURT: Bring in the jury, please.
14)       (The jury entered the courtroom at
15) 4:38 p.m.)
16)       THE COURT: Mr. LeTang, the State may call
17) its next witness.
18)       MR. LETANG: Thank you. The State calls
19) Erica Bell.
20)       THE COURT: We'll be able to go until
21) 5:00 o'clock, but we need to stop then.
22)       MR. LETANG: I understand.
23)       (ERICA BELL, called by the State, after



# NEW CASTLE COUNTY POLICE
## STATEMENT
### CASE NO. 32-00-066857

5 People

**NAME:**        **WILLIAMS, CHRISTOPHER, W/M, DOB 07/26/83**

**ADDRESS:**     **2402 Watersedge Drive, Newark, DE**

**DATE:**        **September 6, 2000**   June 28th ?

**TIME:**        **0922 hours**

**TAKEN BY:**    **Det. Brad Milton**

**LOCATION:**    **Philadelphia, PA (hospital)**

**ALSO PRESENT:**

Q    I'm here at Albert Einstein Hospital. It's Wednesday, September 6th. It's 9:20 in the morning. I'm here with Christopher Williams. Basically it's the first opportunity I've had to speak with Chris about the incident when he was shot by James Mays. And basically, Chris, like I said, it doesn't matter, just tell the whole story, whether you were drunk or not, or whatever, that's irrelevant. All right? So basically I just need you to tell me the whole story.

A    All right, the story is, um, I was passed out on my couch cause I was drunk. I wake up. These three guys, I guess it's three, they were beating up Billy. And, so I get up. I'm like, yo, what's the deal.

Q    What did the guys look like? Black? White?

A    They was all three black.

Q    Three black guys?

A    Pretty sure.

Q    OK

A    And I'm like, what's the deal. They jump up. They all draw guns. They walk out with the pit bull. I guess as they was walking out, one of them blasted me in my neck with a gun. 380, I guess.

Q    OK

A    I don't know why. I guess they just wanted to shoot me. You know, he had no reason to shoot me. I mean, he was going to take the dog no matter what. I didn't care about the dog.

Q    Whose dog was that?

A    It was Billy's dog. I didn't care about the dog. I just wanted to not get shot. He shot me right in the center of my neck. The bullet went through my esophagus, my vocal cords, hit the left side of my spinal cord. It paralyzed me from the neck down. It really messed me up.



141

1    same time, so, yes, I did have the opportunity to look

2    at him, though.

3        Q. You saw the person who fired the gun at you;

4    is that right?

5        A. Yes, sir.

6        Q. Do you know whether you were struck by the

7    first or second shot of the weapon?

8        A. The first shot.

9        Q. The first shot?

10       A. Yes, sir.

11       Q. And who was the person who shot you in the

12   throat?

13       A. James (indicating).

14       Q. You're pointing to James Mays?

15       A. Yes, sir.

16       Q. Any question in your mind that he is the

17   person that shot you?

18       A. No.

19       MR. LETANG:  Thank you.  No further

20   questions.

21       THE COURT:  Mr. Facciolo, you may

22   cross-examine.  We do have to end at quarter to five.

23                   CROSS-EXAMINATION

142

1    BY MR. FACCIOLO:

2        Q. Mr. Williams, at the time of the incident

3    you had mentioned that you were smoking pot and

4    drinking.  That is correct, isn't it?

5        A. No.  I was sleeping at the time of the

6    incident.

7        Q. I apologize.  Is it right before you went to

8    sleep that you were drinking and smoking a joint?

9        A. I had a couple drinks, three to four drinks,

10   I wasn't counting, but I'm pretty sure I stayed up for

11   a little bit after drinking those drinks at least a

12   half-hour.

13       Q. Okay.  And you had the joint before or after

14   the drinks, do you remember?

15       A. Hours before the drinks.

16       Q. Hours before.  At the time that this happened

17   was that an event that was fairly frequent for you to

18   occasionally have a drink or to occasionally do a

19   joint?

20       A. Every now and then I would have a drink.

21       Q. Back then?

22       A. Yes, sir.  Whenever I had the opportunity.

23   Not when ever.  But if I had the opportunity, yes.

143

1        Q. Now, a long time has transpired since the

2    events.  That's no longer a part of your life-style,

3    is it?

4        A. Marijuana?

5        Q. Yes.

6        A. No, sir.

7        Q. And at this point probably the only drugs

8    that you would take would be things that you need to

9    for your rehabilitation, nothing illegal?

10       A. Definitely nothing illegal.  I take

11   Neurontin.  It's a nerve medication, basically simmers

12   them down, because my arm will start burning if I

13   don't take the medication.

14       Q. When you were admitted to the hospital they

15   did a lot of interviewing of you like both at Moss

16   Hospital and at Christiana.  Do you remember some of

17   the interviewing that was done by social workers and

18   doctors and the like when you went to Philadelphia?

19       A. Yes.

20       Q. And without getting overly involved in

21   details is it fair to say that at that time you shared

22   with them that you had tried a lot of drugs prior to

23   this incident?

144

1        A. That is true.

2        Q. And would it be fair to say that when you

3    were first going through rehabilitation in

4    Philadelphia that those medical notes reflect that you

5    were still angry and frustrated that that was probably

6    accurately how you felt at that time?

7        A. Can you rephrase that question?

8        Q. Is it fair to say that when those medical

9    notes reflect that you were very angry and frustrated

10   when you first went to Philadelphia to the hospital

11   that that was an accurate reflection of how you felt

12   at that time?

13       A. Yes, it is.

14       Q. How did you come to be friends with Billy?

15       A. I met him through another friend of mine.

16       Q. Do you remember which friend it was?

17       A. Rudy Rodriquez.

18       Q. And when you first met Billy was your

19   friendship based upon kind of like partying and things

20   like that?

21       A. Yes, something like that.

22       Q. And ignoring the events that happened to you

23   for a moment, is it fair to say that when Billy first

defense counsel was ineffective for failing to "adequately prepare for trial because he did not have adequate time to meet with defendant;"[4] and (8) that defense counsel was ineffective for failing to move for portions of Defendant's criminal record to be redacted.

3.    In response, Defendant's trial counsel, David J. J. Facciolo, Esquire, filed an affidavit, pursuant to Super. Ct. Crim. R. 61(g)(2), in order to respond to Defendant's allegations of ineffective assistance of counsel. Defense counsel responded to Defendant's allegations as they were set forth in Defendant's memorandum in support of his motion for postconviction relief, thus, the arguments are not in the same order as above. First, as to Defendant's argument that defense counsel was ineffective in not raising the motion to suppress Defendant's statement to the police prior to trial, counsel contends that he raised the issue upon first learning of it, even though that happened to be during the trial.[5] Second, counsel asserts that he objected to the allegedly suggestive photo identifications at trial, which, he argues, was appropriate.[6] Third, as to Defendant's assertion that trial counsel failed to raise sufficiency of evidence objections at trial, counsel argues that this

---

[4] *Id.* at 4.

[5] Facciolo Aff. 3, ¶ 1.

[6] *Id.* at 5, ¶ 3.

4

"issue is contradicted by the record."[7]  Fourth, as to the allegation that trial

counsel failed to object to the introduction of Defendant's medical records,

counsel argues that such an objection would have been frivolous and would

have been bad trial practice.[8]  Fifth, as to Defendant's allegation that counsel

ineffectively failed to object to the admission of audiotapes, counsel again

argues that such an objection would have been frivolous and would have

been bad trial practice.[9]  Finally, as to Defendant's assertion that trial

counsel should have objected to the introduction of Defendant's unredacted

statement to the police into evidence, counsel asserts that this was sound trial

practice.[10]

4.      The State also responded to Defendant's motion.  The State's

respective arguments are: (1) that ground one should be procedurally barred

as it was not previously asserted in Defendant's direct appeal and Defendant

has not shown cause or prejudice to have it heard now;[11] (2) that ground two

should be denied as trial counsel's failure to object to the audiotapes did not

---

[7] *Id.* at 5, ¶ 1.

[8] *Id.* at 5-6, ¶¶ 2, 3

[9] *Id.* at 6, ¶¶ 2, 3.

[10] *Id.* at ¶ 1.

[11] State's Resp. 2.

5

53

1   Q. And that is done so that if a person is asked
2   to make an identification there's no suggestion as to
3   if I hand you one photograph I require that you pick a
4   picture out of a series of photographs to avoid that
5   suggestion, correct?
6       A. Correct.
7       Q. Did you prepare a photographic lineup in
8   conjunction with this case?
9       A. Yes, I did.
10      Q. And did you give those photographic lineups
11  to Detective Milton?
12      A. Yes, I did.
13      Q. Thank you. I guess we should mark these for
14  identification purposes. I'm going to ask these be
15  marked with the Court's permission for identification
16  purposes. They're just two sheets of papers.
17      MR. FACCIOLO: Your Honor, we would like to
18  review it for a moment before they're shown to the
19  witness.
20      MR. LETANG: We're just IDing them.
21      THE COURT CLERK: So marked State's
22  Identification B and C.
23      (State's Exhibits B and C were marked for

54

1   identification.)
2       MR. FACCIOLO: No objection to these being
3   marked at this point. Reserve the issue as to whether
4   they should be exhibits.
5       MR. LETANG: Well, I'm going ask the officer
6   to identify these if there's some issue.
7       THE COURT: Let's take the issue to side-bar
8   with the court reporter.
9       (The following side-bar discussion was had:)
10      THE COURT: Mr. Facciolo?
11      MR. FACCIOLO: With regard to the exhibit
12  that has just been handed to the Court, it's clear
13  that my client is the only one with a wide face. I
14  have only gotten to actually see these today, and I
15  think it's suggestive, and I would ask the Court to
16  exclude it.
17      THE COURT: You have no objection to it being
18  identified?
19      MR. FACCIOLO: Nothing to identification, but
20  I don't think it should be admitted at this point, and
21  I'm objecting to it because I think it is unfairly
22  suggestive.
23      THE COURT: Mr. Letang?

55

1       MR. LETANG: I'm not sure I understand what
2   the objection is.
3       MR. FACCIOLO: We're looking at this sheet
4   first.
5       THE COURT: I'm looking at what's been marked
6   as State's Identification C. Number two is your
7   client.
8       MR. FACCIOLO: Uh-huh.
9       THE COURT: And your objection is?
10      MR. FACCIOLO: He is the only one with a
11  round face. It sticks out like a sore thumb by
12  counsel's standards.
13      THE COURT: Mr. Letang?
14      MR. LETANG: Well, I'm not sure it doesn't
15  stick out. I think they all have round or oval faces,
16  and the pictures are all the same dimension, same
17  size. I find and I have done a lot of these things,
18  but I find absolutely nothing suggested by this.
19      MR. FACCIOLO: The other thing I would note
20  is it's a fuller beard, and that's also one of the
21  reference points different from all the others.
22      THE COURT: I'm ready to rule. I have
23  reviewed the photographs in this document. They are

56

1   all of black males apparently in their late teens or
2   early twenties. All of them, I think, including even
3   number one, have some amount of facial hair, but the
4   bottom line is I think it's a remarkably fair listing
5   of individuals. While it's true that photograph
6   number two is a little bit bigger than the others,
7   photograph five is just about the same in terms of
8   enlargement of head and roundness of face as the
9   others.
10      Bottom line is I do not find that this
11  document, a photograph of your client, the defendant,
12  is impermissibly suggestive, so your application to
13  exclude this evidence is denied.
14      MR. FACCIOLO: With regard to the second one
15  I have not had a chance to show this to my client.
16      MR. FACCIOLO: I would ask for one second.
17      MR. LETANG: I want to tell you I left this
18  note on here. This was the lineup that was showed to
19  the victim at the hospital later on, so I'm going to
20  leave this one here, but I'll take it off.
21      THE COURT: Was this ever shown?
22      MR. LETANG: Yes. Not the victim, shown to
23  the witnesses, I'm sorry. This was shown to

A36

5

1  Mr. Facciolo?
2       MR. LETANG:  Yes.
3       MR. FACCIOLO:  It's going to require some
4  decision making on your part.
5       MR. LETANG:  What I would like to do - and we
6  may get to this statement this afternoon - is to give
7  the Court a copy of the statement and allow your Honor
8  to look at that.  I think the areas of contention are
9  about the first six pages, and Mr. Facciolo has
10  advised me, in part, of the last page.
11       THE COURT:  Issue about whether or not those
12  statements should be redacted?
13       MR. FACCIOLO:  It's a double issue.  There
14  clearly is the issue of the redacting.  If there's
15  going to be redacting I only want the last page
16  redacted, but in talking to my client about the
17  redaction today he pointed out to me that Pages 1
18  through 7 it looks like he really was asking for his
19  lawyer, and I want the Court, just on the face of the
20  statement, to decide if it's voluntary.
21       THE COURT:  You were provided with the
22  statement much earlier, were you not?
23       MR. FACCIOLO:  Yes.

6

1       THE COURT:  No motion to suppress was filed?
2       MR. FACCIOLO:  No.  That's correct, but I
3  want to explain to the Court the circumstances of
4  this.
5       Originally when I was discussing this with my
6  client I thought that it was a voluntary statement.
7  I've been limited in my visitation with the client at
8  the prison.  I made a record of that at least four
9  times with this Court at various phases because he is
10  at DCC.  I have to make an appointment, even though I
11  am his attorney.
12       THE COURT:  I understand because I have heard
13  it from other counsel, as well.  That presents its own
14  difficulties.
15       MR. FACCIOLO:  And even during my final visit
16  with my client during the blitz I was limited in my
17  ability to visit with him.  I had reviewed the
18  statements that were made, and in December I had
19  spoken to my client about his statement and the
20  contents of the statement, and in my mind the last
21  page was a problem, but I thought that could be
22  addressed.
23       But when I spoke to my client more carefully

7

1  about it this morning he said, "Mr. Facciolo, but look
2  at all the other times I mention about the lawyer,"
3  and, so, I think that even if it's -- even if it's
4  remiss on my part previously I have to at least put
5  the issue before your Honor either to decide it on its
6  merits, or if the Court decides it can't decide on its
7  merits, and I am precluded because not having made
8  that motion previously then to make that decision for
9  us.  Because this is a case where the record needs to
10  be complete.
11       I do want the Court to know that in terms of
12  whether it should be excluded, my client and I both
13  discussed the fact that it's a decision the Court
14  could make solely on the basis of the statement
15  without any testimony of any kind, unless the State
16  needed to put any testimony on, so I am asking the
17  Court to exclude it as my first choice in terms of
18  relief, paying close attention to Page 27 and Pages 3
19  through 7, and if the Court cannot exclude it then I
20  think the Court needs to redact Page 27 from the point
21  where my client talks about the lawyer.
22       THE COURT:  Any objection to that alternative
23  possibility, Mr. Letang?  If I should decide the

8

1  statement is admissible, nevertheless, to redact out
2  the end of it where --
3       MR. LETANG:  That's certainly acceptable to
4  the State.
5       THE COURT:  So at least if I go that route
6  there's no issue, but there's the separate issue of
7  counsel requesting, in effect, suppression.
8       MR. FACCIOLO:  It's a last minute
9  suppression, in effect, and I have only done that once
10  or twice in my entire career, but I feel I should
11  represent my client zealously.
12       THE COURT:  Well, obviously, the Court likes
13  to get the parties' legal authorities on that.  Tell
14  me the gist of the issue with some passing reference
15  to --
16       MR. LETANG:  The gist of the issue is --
17       THE COURT:  Is it the Crawford case whether
18  the police --
19       MR. LETANG:  The issue has to do with the
20  defendant questioning out loud whether or not he
21  needed a lawyer, and the officer said, you know, that
22  decision is up to you.  And what it appears from the
23  statement is the defendant wanted to find out the

9

1  information the State had about the case that they had
2  against him, and the officer said, "I can't talk to
3  you. If you want your lawyer here I can't give you
4  that information. I can't talk to you."
5       And after that he said, well, I want to find
6  out what you have, then I'll call my lawyer after I
7  find out what you have is what it essentially has.
8       THE COURT: Had a motion to suppress been
9  filed? I hear Mr. Facciolo say that the issue ought
10 to be decided just based on the statement alone.
11      MR. LETANG: I think that's fair. The only
12 question, and I didn't ask the officer this, is
13 whether there was any discussion prior to actually
14 going on tape, but I don't think there was. It's
15 pretty clear that --
16      THE COURT: Well, hand me up a copy of that.
17 Do you have an extra copy?
18      MR. LETANG: Yes.
19      THE COURT: Could I have two copies if you
20 have one?
21      MR. LETANG: Now you're pressing it. That
22 may be -- no. I can give you the original, the
23 officer's copy.

10

1       THE COURT: Is this a copy I can have to mark
2  up?
3       MR. LETANG: Yes. The first six pages and
4  the last page. First six or seven pages.
5       THE COURT: The last page is not in issue.
6  No matter what, the last page comes out.
7       MR. LETANG: Part of the last page. I think
8  there's a part --
9       THE COURT: Where it starts is, "I just got
10 to speak with my lawyer."
11      MR. LETANG: "I'm not afraid of nothing."
12      THE COURT: And right after that is the
13 phrase, "I just got to speak with my lawyer."
14 Everything after that comes out, both sides agree?
15      MR. FACCIOLO: That's correct.
16      MR. LETANG: Yes.
17      MR. FACCIOLO: And the issue of whether it
18 the exclusion begins on Page 4 where my client says
19 that he wants to talk to a lawyer. On Page 5 where he
20 says he doesn't understand the rights for one
21 question. And then the rest of the conversation up
22 through just about Page 7.
23      MR. LETANG: I would start out before that

11

1  about Page 3 is where the rights are begun.
2       MR. FACCIOLO: That would be fair.
3       MR. LETANG: There's some preface to that.
4       MR. FACCIOLO: And I think even on Page 1
5  there's some reference to my client wanting to know
6  why he is there.
7       THE COURT: Can you call my law clerk Joe
8  Koury and ask him to come down to the courtroom right
9  away?
10      THE BAILIFF: Yes, your Honor.
11      THE COURT: I would like to get started on
12 this, so let's get that started.
13      MR. FACCIOLO: But we wanted to alert the
14 Court to the issue so that we don't waste more time
15 away from the jury.
16      MR. LETANG: Your Honor, I would point out
17 one Page 1 passage, which may be of interest to the
18 Court. On Page 4 -- the officer was showing me this.
19 The question, "Okay. Having these rights in mind do
20 you want to talk to me now? Yeah, we can talk all
21 night." That's the defendant speaking. The officer
22 says, "Well, we can't talk. If you want to call a
23 lawyer then you've got to call -- if you want to call

12

1  a lawyer before you talk to me -- is that what you
2  want to do?" And the defendant answers, "I want to
3  know what's going on from you before I speak to my
4  lawyer. I want to know what's going on so I can
5  explain what's happening to him." And the officer
6  says, "Well, I can't work that way. Me and you either
7  talk, have an open discussion with each other or you
8  make the decision not to talk to me and to talk to
9  your lawyer first, which is your right."
10      THE COURT: Is it the gist of the State's
11 position that this was an unambiguous request --
12 unambiguous stated desire when all is said and done to
13 speak with the police?
14      MR. LETANG: Yes.
15      THE COURT: So that no Crawford versus State
16 inquiry by the police as to what he really wanted was
17 necessary, although some seems to be occurring right
18 here. I mean, the State believes this is not a right
19 to counsel invocation or --
20      MR. LETANG: He was Mirandized more than one
21 time. The officer discussed with him he was not going
22 to talk to him if he wanted his lawyer there. And the
23 police, you know, the old Christian barrel speech, we

A    The older-looking man. I can't believe they stole my dog. I just want to be protected from the people that did this cause I'm not trying to get shot. I'm 17. I have a life to live, you know. The younger-looking dude, as soon as he came in, kept asking where everything was at. He was like, where's the money at, where's the money at? He was like, I know you guys got some money. He kept looking under couch cushions. And he never searched my pockets. I had money in my pockets. I don't know why. They just kept looking under couch cushions. I think all they took total was like $10 off the table. Why you got to shoot somebody over $10, you know. They shot him in the throat. If he gets caught, do you think he'll get attempted murder?

Q    I don't know.

A    In the throat is a bad shot. I hope this person does a lot of time.

Q    So they kept asking for money, looking under, looking under the couch?

A    He kept asking where's the money and looking under the couch cushions. He never search either one of our pockets. He was like, I know you guys got money in here. And he was looking under the little sofa couches cushions and then he started digging through the closet. Like if you come in the front door, the closets about 4-6 feet to the left, they started digging through there. And then the back door came in, and all of them were just in the front doorway.

Q    The back door came.......

A    The back door just came open really loud and two people came running in and I remember one of them was a white male. I don't know remember if the other one was a white male, black male, a Puerto Rican, you know. I don't.......

Q    Was that before the shots were fired or after?

A    That was before the shots were fired.

Q    What was Matt doing the whole time?

A    Just standing there, like it didn't have to be this way, you know. He was like, I called you up, whatever, and now you're bull shitting, you won't give us your money, whatever. And then I got punched in the face twice, right after the back door came in and then, we were just standing there with our hands up, it was only me and Mark.

Q    Who punched you in the face?

A    I think it was the older-looking black male. I believe, honestly, it was the older-looking one. Actually I'm positive it was the older-looking one. He punched me twice. Two to three times, actually. I remember being hit twice, it might have been three at the most. It was no more than three. And I fell into like the entertainment system, like by the TV and the stereo. And then I put my hands in the air and Mark stood up and put his hands in the air and we're standing there for about five seconds and they were just pointing their guns at us and me and Mark were like, you know, take whatever you want. We ain't got nuttin' you know. And all of a sudden, I heard pop, pop, and he fell face first onto the table. And when I picked him up, he was like, I'm gonna die, I'm gonna die.

Q    Is that what he said to you?



---

**129**

1    A. I was 16 years old.

2    Q. Did you invite -- was someone invited to come

3    in and stay at your residence during this period of

4    time up until the point that you were shot?

5    A. My friend Billy Miller was staying with us.

6    Q. How did you know Billy Miller up until that

7    time?

8    A. We were just friends, I guess you would say.

9    Q. Were you in school together?

10    A. No, it was summertime.

11    Q. How did it come to be that Billy Miller moved

12    into your mother's residence with you?

13    A. I'm pretty sure it was over a dog. I don't

14    think his mother allowed the dog to stay there, so he

15    asked could he stay at our house for a couple weeks

16    until he got his apartment.

17    Q. And how old was he at the time?

18    A. Sixteen or 17.

19    Q. In relation to shooting do you know on the

20    21st -- do you know about when he moved into your

21    mother's apartment?

22    A. Maybe the 15th, maybe the 12th.

23    Q. Within a week or two of the shooting he had

---

**130**

1    moved in; is that right?

2    A. Yes, sir.

3    Q. And did he have a dog?

4    A. I don't know if he did.

5    Q. Did he have a dog?

6    A. Yes. He had a 14-week old pitbull.

7    Q. And was the dog in the apartment when this

8    happened on the 21st? Was he with the dog in the

9    apartment?

10    A. Yes, sir.

11    Q. Describe for the jury what happened the late

12    evening at that time. What were you doing and who

13    were you doing it with and where were you doing it?

14    Were you in the apartment in the late evening of the

15    20th to the 21st?

16    A. Yes. I was in the apartment. I think my

17    mother left for work, and me and Billy decided to have

18    a couple drinks. I had three, four drinks and went to

19    sleep.

20    Q. Over what period of time did you have three

21    or four drinks?

22    A. An hour, maybe two hours.

23    Q. At the time that you were -- at the time that

---

**131**

1    your blood was analyzed at the hospital you had a

2    blood alcohol reading of .01, which would have

3    technically in a legal sense you would have been right

4    on the bubble as to whether you were intoxicated or

5    not as far as driving a car is concerned.

6        Ignoring that, how would you describe what

7    your abilities were at that time? Were you very

8    intoxicated, not intoxicated, had a few drinks? How

9    would you characterize your status?

10    A. I wasn't that intoxicated. I just wanted to

11    go to sleep.

12    Q. What time did you go to sleep?

13    A. I would say around like 12:30. I wasn't

14    looking at the clock.

15    Q. And when you went to sleep where did you go

16    to sleep?

17    A. On the couch in the living room.

18    Q. Who was with you at that time?

19    A. Billy.

20    Q. And do you know whether or not he was doing

21    any drinking?

22    A. I think he had the same amount of drinks I

23    had.

---

**132**

1    Q. All right. There's been some testimony in

2    this trial that there were a couple of scales, a

3    marijuana pipe, a baggy with some seeds and stems in

4    it of marijuana. Had you smoked marijuana that night?

5    A. Yes, sir.

6    Q. And do you know when you started smoking

7    marijuana?

8    A. Maybe three hours before I started drinking.

9    Q. How much marijuana do you think that you

10    smoked that night?

11    A. I think me and Billy shared a joint.

12    Q. Okay. A joint. One marijuana cigarette,

13    essentially?

14    A. Yes, something like that.

15    Q. Had you smoked any more than that?

16    A. I don't believe so.

17    Q. When you said that you went to sleep where

18    did you go to sleep?

19    A. On the couch in the living room.

20    Q. I'm going to show you an exhibit. Have you

21    seen this before? May I have a moment to -- may I

22    have a moment to show this to the witness? This is

23    State's Exhibit No. 10. Take a look at that, if you

77

1    MR. LETANG:  Thank you.  I offer this as the
2    next State's Exhibit.  I have no further questions of
3    this witness.
4        MR. FACCIOLO:  We have no problem.
5        THE COURT:  Mark it as the next exhibit.
6    Recross-examination, Mr. Facciolo.
7        MR. FACCIOLO:  I have no further questions.
8        THE COURT:  You may step down.  Is this
9    witness to be excused from further testimony in the
10   trial?
11       MR. LETANG:  Yes.
12       THE COURT:  Thank you.  You're excused from
13   further testimony in the trial.
14       THE COURT:  May I see counsel at side-bar
15   without the court reporter on scheduling.  We're about
16   to take a break.
17       Members of the jury as I said we're going to
18   take a brief recess for about 10 minutes or so.  We'll
19   come back.  We'll then take the next State's witness.
20       MR. LETANG:  The doctor is here.
21       THE COURT:  And then we'll take lunch at some
22   point and go until about 2:15 or so and then recess
23   for the day.  I don't know when our lunch recess will

78

1    be, so we'll take out the jury and we'll come back in
2    about 10 minutes.
3        (State's Exhibit No. 15 was admitted into
4    evidence.)
5        (The jury leaves the courtroom.)
6        THE COURT:  Counsel, at side-bar we want one
7    brief matter put on the record.  I indicated I thought
8    probably Count 6, possession by a person prohibited of
9    a deadly weapon ought to be severed, and that's how I
10   ruled, and I said I would cite authority.  Just as an
11   example of one recent state versus Dennis D. Carson ID
12   number 9509018161 decided April 24, 1996 the parties
13   both agreed in that case that that kind of a charge
14   should be severed for trial and the Court ordered it.
15   That case cited State versus Loper decision of Judge
16   Steele where he had held that possession of a person
17   prohibited charge should be tried along with other
18   charges would cause sufficient prejudice to outweigh
19   any interest of judicial economy I think has become
20   the practice, except for good reason otherwise, to
21   sever out possession of a deadly weapon by a person
22   prohibited, unless there's some compelling need to try
23   it together.  So I just thought I would make the

79

1    ruling.  We're in recess for about 10 minutes.
2        (Break taken.)
3        THE COURT:  Counsel, just on scheduling I
4    think the defendant is being brought up from
5    downstairs.  The State estimates the doctor's direct
6    examination will be about?
7        MR. LETANG:  It will be no more than 10, 15
8    minutes.
9        THE COURT:  And?
10       MR. FACCIOLO:  I anticipate about a half-hour
11   to 40 minutes.
12       THE COURT:  Well, let's work to complete that
13   testimony today.
14       MR. LETANG:  That's surprising me because I
15   thought the testimony would be a lot briefer than
16   that.
17       MR. FACCIOLO:  I think we're going to be
18   asking about the prognosis of the victim, and I might
19   be asking a couple questions relating to the
20   underlying treatment that led to the prognosis.
21       THE COURT:  Well, take what time you fairly
22   need, but let's also move along.
23       MR. FACCIOLO:  We have agreed that the

80

1    medicals are going to be fully entered, but we wanted
2    to suggest the possible proposed cautionary
3    instruction.
4        THE COURT:  Counsel agreed to this?
5        MR. LETANG:  That's fine with the State.
6        THE COURT:  When do counsel propose that this
7    instruction be given?
8        MR. FACCIOLO:  We may as well stipulate them
9    into evidence officially, so it can be done before the
10   witness.
11       MR. LETANG:  I have no preference, your
12   Honor.  I think what we can do is bring the jury in,
13   and when we get to that portion I asked to have it
14   marked as an exhibit.  Mark it as an exhibit and the
15   Court can read the instruction to the jury.
16       THE COURT:  As soon as the documents are
17   proffered into evidence I guess by the State after
18   that's happened I'll then give this instruction.  Is
19   that satisfactory?
20       MR. FACCIOLO:  That's correct.
21       THE COURT:  Please bring in the jury.
22       (The jury enters the courtroom.)
23       THE COURT:  Is there any thought that any of

81

1    these crimes in the medical records should be

2    redacted?

3        MR. FACCIOLO: Your Honor, it would be too

4    difficult to redact it, and I'm the defense counsel.

5    I think the cautionary instruction is about the best

6    we can do.

7        THE COURT:   The State agrees.

8        MR. LETANG:  I agree with that.

9        THE COURT:   All right. I don't then

10   understand the defendant asking for redactions.

11       (The jury enters the courtroom.)

12       THE COURT:  Members of the jury, on timing I

13   think what we'll probably do, we don't usually do

14   this, is to just go all the way until the end of our

15   witnesses today and then just adjourn, and you can

16   have lunch after we adjourn.  It will be after 2:00.

17   I hope you're not too hungry.  We're just trying to

18   move forward to make up ground.  Thank you for your

19   understanding.  The State may call its next witness.

20       MR. LETANG:  The State calls Dr. Bohatiuk

21       GEORGE BOHATIUK, having been called on the

22   part and behalf of the State as a witness, being first

23   duly sworn under oath, testified as follows:

82

1                DIRECT EXAMINATION

2    BY MR. LETANG:

3        Q. Dr. Bohatiuk, good afternoon.  Would you tell

4    the jury, please, what is your area of specialization?

5        A. I'm a physician specializing in physical

6    medicine and rehabilitation.

7        Q. And how long have you been so employed in

8    that capacity?

9        A. Since 1990.

10       Q. And where is your practice located?

11       A. 500 Christiana Medical Center, Newark,

12   Delaware.

13       Q. And how long have you been working in that

14   capacity in Delaware?

15       A. Since February of 1998.

16       Q. I have in front of me a curriculum vitae and

17   would ask you to take a look at that, please.  This is

18   a resume' I'm handing to the witness.  May I give it

19   to the witness?

20       THE COURT:  Yes.

21   BY MR. LETANG:

22       Q. Take a look at that and tell me if you

23   recognize what's contained on that document?

83

1        A. Yes, this is my resume'.

2        Q. And that is a history of your training,

3    experience, publications, board certifications, et

4    cetera, as far as your practice is concerned of

5    medicine, correct?

6        A. Yes.

7        MR. LETANG:  Your Honor, I would offer this

8    as the next State's Exhibit.

9        MR. FACCIOLO:  No problem whatsoever with

10   that.

11       MR. LETANG:  Thank you.  That's been marked

12   previously as State's 16.

13       (State's Exhibit No. 16 was admitted into

14   evidence.)

15   BY MR. LETANG:

16       Q. Without going into great length would you

17   tell us where you did your undergraduate work, please?

18       A. Yes.  I went to Lemoin College in Syracuse,

19   New York, then I went to Upstate Medical School in

20   Syracuse, New York and graduated in 1983.  I then did

21   two three-year residencies, the first in internal

22   medicine where I completed it at the University of

23   Medicine and Dentistry in Newark, New Jersey, the

84

1    second at the University of Pennsylvania Physical

2    Medicine and Rehabilitation.  I am board certified in

3    physical medicine and rehabilitation, as well as

4    internal medicine.

5        Q. What is the area of medical rehabilitation?

6    Describe that for us.

7        A. Physical medicine and rehabilitation is that

8    subspecialty in medicine that deals with the

9    diagnosis, prognosis and treatment of patients with a

10   variety of musculoskeletal and neurological illnesses,

11   anything from pain to loss of use of a limb or in a

12   situation like this where there's loss of function in

13   entire body parts.

14       Q. Did you have occasion in that capacity to

15   treat as a patient Christopher Williams?

16       A. Yes.

17       Q. And when did you first come into contact with

18   him, please?

19       A. I first evaluated Christopher Williams on May

20   14th, 2001.

21       Q. And did he come to you as a patient or was he

22   referred to you by someone else?

23       A. He came to me as a patient.

Page 13

1) that there is no voluntariness objection to this
2) out-of-court statement. Any objection to that
3) procedure otherwise, Mr. Facciolo?
4)        MR. FACCIOLO: No, no problem.
5)        THE COURT: I assume there are no redaction
6) issues of any kind on the statement on the tape?
7)        MR. FACCIOLO: Not to my knowledge.
8)        MR. LETANG: And the last thing, I also
9) have some transcripts which I've made sufficient
10) numbers for the jury. If the Court would permit, I
11) would like those to be circulated to the jury, not as
12) evidence.
13)        THE COURT: I did not know those were
14) coming, I did not bring down an Atkins transcript
15) instruction. I'll ask my -- let me speak to the
16) bailiff first to get that underway.
17)        About how long will that be until you're
18) providing transcripts to the jury, how many minutes?
19)        MR. LETANG: Two.
20)        THE COURT: If I'd known, I would have had
21) a transcript instruction.
22)        MR. LETANG: I'm sorry.
23)        THE COURT: I'm going to recess -- well --

Page 14

1)        MR. FACCIOLO: Your Honor --
2)        THE COURT: And I've asked the bailiff to
3) go and have my secretary bring down a transcript
4) instruction because I want to get it word for word
5) identical to the pattern instruction.
6)        Is there anything we can take up or have
7) testimony about before the transcript instruction is
8) received?
9)        MR. LETANG: I have a couple of brief
10) questions for this witness, but there are only a few.
11)        THE COURT: All right. Well, let's --
12)        MR. FACCIOLO: With regard to the
13) transcripts, Your Honor, we have no objection if for
14) every statement that's recorded that a copy of the
15) transcript ultimately goes to the jury during their
16) deliberations. It may actually be helpful to them.
17)        THE COURT: Well, I think what the State
18) was going to do was have 12 or 15 --
19)        MR. LETANG: Fifteen.
20)        THE COURT: -- copies given now, which is
21) relatively customary. Any objection to that
22) procedure, although only one copy would go to the
23) jury during deliberations? My concern is -- that's

Page 15

1) exactly what I'm asking for.
2)        Transcript instructions are done one of two
3) ways, one with the transcript being admitted, one
4) with it not. Is the State seeking to admit the
5) transcript into evidence?
6)        MR. LETANG: Yes.
7)        MR. FACCIOLO: We have no objection.
8)        THE COURT: All right. Then it will be
9) admitted as the next State's exhibit. And while the
10) bailiff is getting that, if the prothonotary could
11) bring in the jury, I'll appreciate that.
12)        THE CLERK: Sure.
13)        The bailiff is getting them, Your Honor.
14)        (The jury entered the courtroom at
15) 11:40 a.m.)
16)        THE COURT: Members of the jury, I do
17) apologize for the delay in getting started. It was
18) not possible, although we asked you to come back at
19) 10:00 o'clock, to begin the trial until right now,
20) which we've now done.
21)        But before we continue with the
22) examination, let me ask you collectively if, during
23) the overnight recess, you discussed the case with

Page 16

William Miller - Direct
1) anyone or allowed anyone to discuss it with you?
2)        All jurors are indicating in the negative,
3) so we can continue with the direct examination of
4) Mr. Miller. Please resume the witness stand and I
5) remind you, you're under oath from yesterday.
6)        (WILLIAM MILLER, called by the State, after
7) having been previously sworn, was examined and
8) testified as follows:)
9)        DIRECT EXAMINATION (continued)
10) BY MR. LETANG:
11)   Q. Mr. Miller, I just have a few questions
12) before we play the tape recorded statement you
13) provided to the police on the 21st. That statement
14) was given to the officers the same night of this
15) incident, this shooting; is that correct?
16)   A. Correct.
17)   Q. And I think you testified previously that
18) you left in a police vehicle and were taken over to
19) headquarters and it was at that location you gave a
20) statement.
21)   A. Correct.
22)   Q. If I were to tell you the statement itself
23) was taken about 3:00 -- about 3:00 o'clock in the

**1**

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE,           ID NO. 0006015793

     Plaintiff,

v.

JAMES A. MAYS,

     Defendant.

RECEIVED

JUL 2 9 2002

BY:

BEFORE:  HONORABLE RICHARD R. COOCH, J.
     and jury

APPEARANCES:

     PETER N. LETANG, ESQ.
     Deputy Attorney General
     for the State

     DAVID J. J. FACCIOLO, ESQ.
     for the Defendant

     TRIAL TRANSCRIPT
     March 6, 2002

     REGINA A. TELL, RPR, CSR, CRR
     SUPERIOR COURT OFFICIAL REPORTERS
  1020 King Street - Wilmington, Delaware 19801
     (302) 577-2400 Ext. 414

**2**

1               March 6, 2002
               Courtroom No. 201
2               10:00 a.m.

3  PRESENT:

4     As noted.

5

6     THE COURT:  Good morning, counsel, everyone.
7     MR. LETANG:  Your Honor, good morning.
8     THE COURT:  Sorry for being delayed getting
9  on the bench. After I didn't hear our last juror did
10  arrive. Juror No. 3 expressed a concern to the
11  bailiff about this case going into next week, which it
12  seems likely to do.
13     MR. FACCIOLO:  Is that Miss Bonvonetti?
14     THE COURT:  No, Juror No. 3, who is a
15  different juror.
16     MR. LETANG:  Your Honor, in looking at this,
17  I think that if we move along with some dispatch that
18  I can be finished tomorrow. Tomorrow. And I think
19  that Mr. Facciolo indicated his defense would be about
20  an hour and a half, I think he said, so,
21  theoretically, this could go to the jury --
22     THE COURT:  Friday afternoon.

**3**

1  it would be going to the jury, probably lunchtime
2  Friday at the earliest.
3     THE COURT:  Well, I think -- any reason why
4  we couldn't tell the jury that's our present
5  expectation, that there is the possibility that the
6  trial deliberations phase might continue into next
7  week, and does any juror have a potential problem with
8  coming back on Monday and giving them that early
9  warning?
10     MR. LETANG:  I anticipate there may be a
11  rebuttal witness, but in fairness, I think that may be
12  a good idea.
13     THE COURT:  I'm going to have to discuss
14  whether or not we go on Monday, which is requested
15  that trials, all things being equal, trials not go on
16  Mondays to get things accomplished at the case review
17  calendar, but we'll talk about that later.
18     MR. LETANG:  Yes. That's one other issue we
19  need to address. I brought up with Mr. Facciolo this
20  morning an issue which I anticipated probably we
21  should resolve at the outset before this is done
22  before the jury. The defendant in this case made a
23  statement to the police officer at the time he was

**4**

1  arrested.
2     That statement is memorialized by an
3  audiotape, and this is the statement he made on the
4  21st of June. The statement itself is about 28, 27
5  pages. There is in that statement initially
6  references or discussions about whether or not he
7  wished to exercise his Miranda prerogatives, and that
8  was -- what I'm telling the Court now has never been
9  addressed. I brought it to Mr. Facciolo's attention
10  this morning, that there were -- there was some
11  resuscitation about whether he was concerned whether
12  he wanted a lawyer, didn't want a lawyer. There's no
13  issue as far as the State is concerned, and I assume
14  the defense, that there was any sort of enticement by
15  the officer to do that, but there's that reference.
16     He then gives a statement to the police. At
17  some point in time towards the last part of that
18  statement he decides to invoke. It is my intent to
19  play that tape, and what I wanted to do is seek the
20  Court's guidance and Mr. Facciolo's thoughts on this
21  to determine whether or not there were some concerns
22  and what I would suggest we do.
23     THE COURT:  Have you talked about this with

5

1  Mr. Facciolo?

2       MR. LETANG:  Yes.

3       MR. FACCIOLO:  It's going to require some

4  decision making on your part.

5       MR. LETANG:  What I would like to do - and we

6  may get to this statement this afternoon - is to give

7  the Court a copy of the statement and allow your Honor

8  to look at that.  I think the areas of contention are

9  about the first six pages, and Mr. Facciolo has

10  advised me, in part, of the last page.

11       THE COURT:  Issue about whether or not those

12  statements should be redacted?

13       MR. FACCIOLO:  It's a double issue.  There

14  clearly is the issue of the redacting.  If there's

15  going to be redacting I only want the last page

16  redacted, but in talking to my client about the

17  redaction today he pointed out to me that Pages 1

18  through 7 it looks like he really was asking for his

19  lawyer, and I want the Court, just on the face of the

20  statement, to decide if it's voluntary.

21       THE COURT:  You were provided with the

22  statement much earlier, were you not?

23       MR. FACCIOLO:  Yes.

6

1       THE COURT:  No motion to suppress was filed?

2       MR. FACCIOLO:  No.  That's correct, but I

3  want to explain to the Court the circumstances of

4  this.

5       Originally when I was discussing this with my

6  client I thought that it was a voluntary statement.

7  I've been limited in my visitation with the client at

8  the prison.  I made a record of that at least four

9  times with this Court at various phases because he is

10  at DCC.  I have to make an appointment, even though I

11  am his attorney.

12       THE COURT:  I understand because I have heard

13  it from other counsel, as well.  That presents its own

14  difficulties.

15       MR. FACCIOLO:  And even during my final visit

16  with my client during the blitz I was limited in my

17  ability to visit with him.  I had reviewed the

18  statements that were made, and in December I had

19  spoken to my client about his statement and the

20  contents of the statement, and in my mind the last

21  page was a problem, but I thought that could be

22  addressed.

23       But when I spoke to my client more carefully

7

1  about it this morning he said, "Mr. Facciolo, but look

2  at all the other times I mention about the lawyer,"

3  and, so, I think that even if it's -- even if it's

4  remiss on my part previously I have to at least put

5  the issue before your Honor either to decide it on its

6  merits, or if the Court decides it can't decide on its

7  merits, and I am precluded because not having made

8  that motion previously then to make that decision for

9  us.  Because this is a case where the record needs to

10  be complete.

11       I do want the Court to know that in terms of

12  whether it should be excluded, my client and I both

13  discussed the fact that it's a decision the Court

14  could make solely on the basis of the statement

15  without any testimony of any kind, unless the State

16  needed to put any testimony on, so I am asking the

17  Court to exclude it as my first choice in terms of

18  relief, paying close attention to Page 27 and Pages 3

19  through 7, and if the Court cannot exclude it then I

20  think the Court needs to redact Page 27 from the point

21  where my client talks about the lawyer.

22       THE COURT:  Any objection to that alternative

23  possibility, Mr. Letang?  If I should decide the

8

1  statement is admissible, nevertheless, to redact out

2  the end of it where --

3       MR. LETANG:  That's certainly acceptable to

4  the State.

5       THE COURT:  So at least if I go that route

6  there's no issue, but there's the separate issue of

7  counsel requesting, in effect, suppression.

8       MR. FACCIOLO:  It's a last minute

9  suppression, in effect, and I have only done that once

10  or twice in my entire career, but I feel I should

11  represent my client zealously.

12       THE COURT:  Well, obviously, the Court likes

13  to get the parties' legal authorities on that.  Tell

14  me the gist of the issue with some passing reference

15  to --

16       MR. LETANG:  The gist of the issue is --

17       THE COURT:  Is it the Crawford case whether

18  the police --

19       MR. LETANG:  The issue has to do with the

20  defendant questioning out loud whether or not he

21  needed a lawyer, and the officer said, you know, that

22  decision is up to you.  And what it appears from the

23  statement is the defendant wanted to find out the

## Certificate of Service

I, _James A. Mays_ ,hereby certify that I have served a true

And correct cop(ies) of the attached: _Opening Brief For Writ of_

_Habeas Corpus_ upon the following

parties/person (s):

TO: _Office of the Clerk_

_United States District Court_

_844 N. King Street Lockbox 18_

_Wilmington, Delaware 19801-3570_

_____

TO: _Office of the Attorney General_

_820 N. French Street_

_____

_Wilmington, Delaware_

_19801_

TO:_____

_____

_____

_____

_____

TO: _____

_____

_____

_____

_____

BY PLACING SAME IN A SEALED ENVELOPE, and depositing same in the United
States Mail at the Delaware Correctional Center, Smyrna, DE 19977.

On this _29th_ day of _September_ ,200_7_

_James A. Mays_

TO: Main Law Library                    9-27-07

FROM: James A. Mays
        # 295762
        D-East

RECEIVED
SEP 28 2007
DCC Law Library

RE: Copies Of Legal Documents

Dear Law Library Para-Legal

      I would like to request 5-(five) copies
Of this Habeas Corpus, none of the pages are
double sided, I would like to also request that
the 5 copies be stapled in the order that I
have sent the original, please do not staple
the original. There is a total of 59 pages.

                        Thank you
                        James A. Mays

**Motions**            **D-E**

P.S. Needs To Be
~~F~~**295** By
10-1-0*7

                    **Order#    17255**

9/28/2007   12:58:20 PM

I/M James A. Mays
SBI# 295762    UNIT D - East
DELAWARE CORRECTIONAL CENTER
1181 PADDOCK ROAD
SMYRNA, DELAWARE 19977

Office of the Clerk
United States District Court
844 N. King Street Lockbox 18
Wilmington, Delaware
19801 - 35-70

" LEGAL "
Mail